In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1013

United States of America,

Plaintiff-Appellee,

v.

Georgia R. Freitag,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 99 CR 218--Rebecca R. Pallmeyer, Judge.

Argued May 18, 2000--Decided October 31, 2000

Before Posner, Diane P. Wood, and Williams,
Circuit Judges.

Williams, Circuit Judge.  A jury
convicted Defendant Georgia R. Freitag of
several crimes relating to her alleged
scheme to defraud the federal government
by submitting false Medicare
reimbursement claims on behalf of an
ambulance company she operated. Based in
part on findings regarding the amount of
money involved in her fraud and Freitag's
truthfulness at trial, the district court
sentenced Freitag to 41 months'
imprisonment. On appeal, Freitag
challenges her convictions and sentence.
Concerning her convictions, Freitag
contends that the district court
committed reversible error by refusing to
excuse a sleeping juror and by allowing
the government to elicit comments on her
credibility and the credibility of other
witnesses during her cross-examination.
As to her sentence, Freitag asserts that
the district court erred in making its
fraud loss calculation and by imposing an
obstruction of justice enhancement under
the Sentencing Guidelines. For the
reasons stated below, we affirm Freitag's

convictions and sentence.

I

In 1979, Freitag began operating a small ambulance service out of a funeral home that she and her husband had purchased in Wilmington, Illinois. Over the years, her ambulance service grew, and in 1995, she incorporated the business as Freitag Ambulance Corporation (FAC) and opened offices in Joliet, Illinois, and Wilmington. The vast majority of FAC's business involved pre-arranged, non-emergency ambulance transportation for elderly individuals. Freitag's alleged fraudulent activity arose out of her efforts to obtain Medicare reimbursement for ambulance transportation to Medicare beneficiaries. At trial, the government attempted to show that Freitag engaged in a scheme to defraud the Medicare program by submitting false reimbursement claims./1

Under the Medicare program, which provides federally-funded health insurance benefits to individuals age 65 and older, ambulance service providers, like FAC, are entitled to Medicare reimbursement if the ambulance transportation is "medically necessary." Ambulance transportation is deemed medically necessary when other means of transportation would jeopardize a patient's health. To obtain a reimbursement, an ambulance service provider must submit a claim to the insurance carrier that processes Medicare claims in the state in which the provider does business. During the relevant time period in this case, the insurance carrier that processed Medicare claims in Illinois was Blue Cross/Blue Shield of Illinois ("Blue Cross").

FAC office employees Lisa Watson and Janet McLaughlin testified that Freitag instructed them to bill Blue Cross for any ambulance transportation involving Medicare beneficiaries./2  Watson testified that she submitted Medicare claims electronically, using the "WA" medical necessity modifier (or billing code),/3 as instructed by Freitag. According to Watson, Freitag was present during conversations in which FAC emergency medical technicians indicated that certain Medicare beneficiaries did

not need ambulance transportation. Watson testified that she spoke to Freitag about Medicare bulletins that pertained to ambulance billing, but Freitag never made any changes to FAC's billing practices. Watson further stated that she told Freitag that FAC's billing practices "had to stop" after they attended a seminar dealing with Medicare fraud.

In May 1996, Blue Cross received two anonymous calls indicating that FAC may have been submitting false Medicare reimbursement claims. Blue Cross initiated a fraud investigation by sending FAC a document request seeking ambulance "run sheets" for certain Medicare beneficiaries./4 Upon receiving the document request, Freitag instructed Watson and McLaughlin to retrieve and alter approximately 300 run sheets. In accordance with her instructions, Watson and McLaughlin blotted out "WC" or "wheelchair" from the run sheets and indicated that the patients could be moved by stretcher only.

McLauglin subsequently called a fraud hotline at Blue Cross to report that the run sheets had been falsified. Blue Cross referred the case to the U.S. Department of Health and Human Services ("HHS"), Office of Inspector General, to initiate a criminal investigation. After a HHS agent obtained duplicates of the run sheets from the Riverside Medical Center in Kankakee, Illinois, the agent discovered alterations in the set that FAC had sent to Blue Cross. Two federal agents then went to FAC to interview Freitag.

During the interview, the agents advised Freitag that they believed that alterations were made to the run sheets. Freitag initially stated that she had no knowledge of how the alterations were made. According to the testimony of one agent, however, Freitag later indicated that she did not want Watson or McLaughlin to get in trouble and she inquired whether the agents could "assume" that she had instructed Watson and McLaughlin to make changes to the run sheets.

Nearly a year after the interview, but while the criminal investigation was

pending against FAC, Freitag contacted Brenda Lalumendre, an office manager for a doctor's office, and asked her to prepare letters on behalf of one of the doctors (Dr. Gant) for whom she worked stating that it was medically necessary for FAC to transport certain Medicare patients to the office by ambulance. Freitag then faxed Lalumendre a list of transportation dates and patients for which she wished the letters to cover. Over the next four months, Freitag called Lalumendre repeatedly requesting the letters. Lalumendre eventually contacted Medicare to obtain a copy of the guidelines pertaining to ambulance billing. After she realized that Medicare did not cover ambulance transportation for the patients for whom Frietag was seeking letters, Lalumendre testified that she did not provide Freitag with any letters.

In further support of its case, the government called former FAC emergency medical technicians to testify against Freitag. They testified that in most instances they did not perform medical services when transporting certain Medicare beneficiaries to and from doctors' offices, dialysis centers, or rehabilitation centers. They also testified about occasions when certain Medicare beneficiaries walked to and from the ambulance without assistance. The government further admitted into evidence the falsified ambulance run sheets, seven Medicare checks payable to FAC, and a chart showing that FAC billed over $500,000 in Medicare reimbursement claims for seven Medicare beneficiaries, which the government believed were medicallyunnecessary.

In her defense, Freitag called Dr. Katherine Katsoyannis to testify as an expert witness. Dr. Katsoyannis testified that certain patients required ambulance transportation based on their medical records. On cross-examination, however, Dr. Katsoyannis admitted that she had never seen or examined any of the patients she was testifying about, or reviewed any interview reports of the FAC emergency medical technicians who transported them.

Freitag also testified in her own

defense. She testified that she never intended to defraud Medicare. She stated that every claim she submitted to Medicare was medically necessary. According to Freitag, she instructed Watson and McLauglin to alter the ambulance run sheets only because she was "petrified" by the prospect of an audit. She testified that she was "scared as hell" when the federal agents interviewed her because they allegedly screamed, yelled, and accused her of altering run sheets. She stated that she told the agents that she only transported Medicare beneficiaries when medically necessary. She also testified that she did not request letters from Lalumendre in response to the criminal investigation into FAC's billing practices.

On the basis of the evidence introduced at trial, a jury found Freitag guilty of all charges brought in the indictment, including eight counts of mail fraud, in violation of 18 U.S.C. sec. 1341, seven counts of submitting false claims to the government, in violation of 18 U.S.C. sec. 287, and one count of health care fraud, in violation of 18 U.S.C. sec. 3231. The district court sentenced Freitag to 41 months' imprisonment followed by two years' supervised release with a special condition of 150 hours community service, a $1,250 special assessment, and $506,713 in restitution. On appeal, Freitag challenges her convictions and sentence.

II
A. Freitag's Challenges to Her Convictions

1. The Sleeping Juror

Freitag contends that the district court committed reversible error by refusing to excuse a sleeping juror. At trial, one of the jurors apparently fell asleep, though the parties dispute the extent of the juror's slumber. Late in the trial, when a question regarding another juror was raised, defense counsel asked the court to remove the juror that had been sleeping. The district judge declined, noting that she had only twice noticed his inattentiveness and she did not think it was necessary to excuse the juror. The judge then instructed counsel for both

sides to alert her if they noticed the juror sleeping again.

If sleep by a juror makes it impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial, the sleeping juror should be removed from the jury. See United States v. Kimberlin, 805 F.2d 210, 244 (7th Cir. 1986); United States v. Bradley, 173 F.3d 225, 230 (3d Cir. 1999); United States v. Springfield, 829 F.2d 860, 864 (9th Cir. 1987). However, a court is not invariably required to remove sleeping jurors, Springfield, 829 F.2d at 864, and a court has considerable discretion in deciding how to handle a sleeping juror, United States v. Wilcox, 50 F.3d 600, 603 (8th Cir. 1995). Reversal is appropriate only if the defendant was deprived of his Fifth Amendment due process rights or his Sixth Amendment right to an impartial jury. Springfield, 829 F.2d at 864. We review the district court's handling of this matter for an abuse of discretion. Bradley, 173 F.3d at 230.

Here, there is no evidence that the sleeping juror missed large portions of the trial or that the portions missed were particularly critical. As noted earlier, the parties dispute the extent of the juror's slumber, and defense counsel failed to raise the matter when he first noticed the sleeping juror. Indeed, he waited nearly a week before alerting the district judge. Once he raised the issue, the Assistant United States Attorney (AUSA) stated that she had only noticed the juror "closing his eyes" on one occasion. Given that counsel for both sides had noticed the juror's inattentiveness, the wiser practice would have been to raise the issue as soon as practicable. Then, the district judge could have taken the necessary steps to address the issue as she did when defense counsel finally alerted her. Unfortunately, defense counsel opted to wait, and by the time he raised the issue, the district judge found it unnecessary to dismiss the juror because she had not noticed an extensive sleeping problem. Given the state of the record, we find no basis for concluding that Freitag was deprived of due process, an impartial jury, or for that matter, a

fair trial.

Freitag contends that the district judge should have inquired further into this matter to determine how much and which evidence the sleeping juror might have missed. The district judge declined to address "memory lapses" because "[t]hat can go on even when a juror appears attentive." We find no abuse of discretion by the district judge, especially since she had not noticed an extensive sleeping problem and she admonished counsel on both sides to alert her to any further sleeping episodes.

2.  Questions Concerning Credibility of Witnesses

During Freitag's cross-examination, counsel for the prosecution asked Freitag several questions regarding whether she was lying and whether other witnesses were lying or telling the truth. Freitag contends that these questions were impermissible and that the resulting prejudice requires that the court grant her a new trial./5

Because credibility questions are for the jury, it is improper to ask one witness to comment on the veracity of the testimony of another witness. See United States v. Cole, 41 F.3d 303, 308 (7th Cir. 1994); United States v. Sullivan, 85 F.3d 743, 749-50 (1st Cir. 1996). While conceding that under this rule it was improper for the AUSA conducting Freitag's cross-examination to ask her if other witnesses were lying, the government contends that it was not improper to ask Freitag whether she, herself, was lying because it is appropriate to ask a witness whether she is adhering to her oath. The government further asserts that it was not improper to ask Freitag whether other witnesses' testimony was true. In support of this assertion, the government characterizes questions about whether another witness's testimony is true as questions about whether the witness's testimony is accurate.

From our review of the record, the

government's cross-examination of Freitag was far from model. In some instances, the government asked questions that called on Freitag to comment essentially on the truthfulness, not the accuracy, of other witnesses' testimony. The district judge properly sustained a number of objections because that sort of questioning invades the province of the jury; indeed asking if testimony is true implies that if it is not, it is a lie, which is a credibility question for the jury to decide. However, we are not troubled by the prosecutor asking a witness to remark on the truthfulness of her own testimony because the witness's reaction and response are proper fodder for the jury's credibility determinations.

Assuming arguendo that all the questions Freitag objects to are improper, we find the resulting error to be harmless. The challenged questions constituted only a small portion of the entire cross-examination and there was no significant impact on Freitag's defense. More importantly, the evidence against Freitag was overwhelming.

Freitag's office employees (Watson and McLaughlin) testified about FAC's improper billing practices and Freitag even admitted to falsifying records in response to a fraud investigation by Blue Cross, which processed Medicare claims in Illinois. The record also contained testimony from former FAC emergency medical technicians who testified that certain Medicare beneficiaries did not require ambulance transportation. Moreover, Lalumendre testified that Freitag pressured her to write doctor's letters stating that it was medically necessary to transport certain Medicare beneficiaries by ambulance. Therefore, the improper questions do not warrant a reversal because the government introduced substantial evidence of Freitag's guilt.

B. Freitag's Challenges to Her Sentence

1. Calculation of Loss

In fraud cases, the sentence a defendant

receives depends upon the amount of loss involved in the defendant's crime. See U.S.S.G. sec. 2F1.1. In this case, the large number of fraudulent claims (over 8,000) and the extensive period over which the claims were submitted (seven years) made a precise calculation of loss impractical. Accordingly, the government turned to a group of statistical experts to devise a statistical survey that would produce or generate an estimate of loss.

The experts selected a sample of 200 claims from a 15- month period and determined how much of the Medicare money Freitag took in with respect to those claims was fraudulently procured. Then, this result was extrapolated to estimate how much of the Medicare money Freitag took in over the 15-month period was fraudulently procured. The final estimate was $506,713.

The court accepted this figure as the amount of fraud loss and, under U.S.S.G. sec. 2F1.1, increased Freitag's offense level by 10 as the loss exceeded $500,000. Freitag contends that admitted errors by the nurse, who evaluated which of the Medicare reimbursement claims were improper, undermine the validity of the loss determination. As this is a challenge to the factual determinations underlying the district court's loss calculation, we review the district court's finding of fact for clear error. United States v. Mattison, 153 F.3d 406, 412 (7th Cir. 1998).

Here, the amount of loss resulting from Freitag's fraud was calculated over only a 15-month period even though the fraudulent activity took place over a seven-year period. As the government points out, the loss determination is quite conservative given the scope and duration of Freitag's fraud scheme. Moreover, Freitag was given the benefit of the doubt with respect to each claim (in the 200 sampled) that for one reason or another could not be evaluated. As the Sentencing Guidelines only require a "reasonable estimate of the loss," see U.S.S.G. sec. 2F1.1 cmt. 9, we find nothing unreasonable about the district court's loss determination based on the record. Moreover, even if the district

court had taken into account the two claims on which the evaluating nurse admitted error, the amount of loss would still exceed $500,000./6 Thus, a redetermination of the fraud loss is unjustified.

2. Obstruction of Justice Enhancement

In sentencing Freitag, the district court adjusted her offense level upward after concluding that Freitag had obstructed justice within the meaning of U.S.S.G. sec. 3C1.1 by committing perjury at trial. The district court found that Freitag had lied in testifying about three matters: (1) calls she made to a doctor's office; (2) the conduct of a federal agent during the investigation; and (3) whether certain (unspecified) conversations with her employees occurred. Freitag challenges the district court's obstruction of justice ruling on the grounds that the court did not make the necessary findings on the elements of perjury and that at least the first two instances of alleged perjury do not actually qualify as perjury. This court reviews the adequacy of a district court's perjury findings de novo and reviews a district court's factual findings that the defendant committed perjury for clear error./7 United States v. Gage, 183 F.3d 711, 715 (7th Cir. 1999).

Under the Sentencing Guidelines, perjury at trial constitutes obstruction of justice and subjects a defendant to an upward adjustment in offense level. U.S.S.G. sec. 3C1.1 cmt. 4; United States v. Dunnigan, 507 U.S. 87, 94 (1993). A defendant commits perjury under this provision if he or she "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." Dunnigan, 507 U.S. at 94. While it is advisable for a district court to make specific and clear findings on each instance of perjury, all that is required to impose the obstruction of justice enhancement on perjury grounds is that the court make a finding that encompasses the factual predicates for a finding of

perjury. Id. at 95.

Freitag first contends that the district court did not make sufficient findings of specific intent with respect to any of the three alleged instances of perjury. However, this position cannot be maintained in face of the following statement made by the district judge, "I didn't believe Miss Freitag's testimony was the result of confusion, mistake, or faulty memory. I thought it really did function more as a creative revision of what had happened." Similarly, Freitag challenges the sufficiency of the district court's findings concerning her testimony about whether conversations with certain employees occurred. She claims the district court erred by not specifying which employees or conversations it was referring to. Dunnigan does not require such specificity, however. The district court found that her testimony was intentionally given, false, and material; nothing more is required under Dunnigan in the way of findings. And, as the government has shown, there is more than sufficient factual support in the record for the district court's finding./8

Freitag further contends that neither of the first two alleged instances of perjury in fact constituted perjury. The government concedes that her testimony about the conduct of the federal agents does not support a perjury finding because it was not material, but the government does insist that her testimony regarding the timing of calls she made to a doctor's office (in an effort to have a doctor indicate that certain patients qualified for Medicare-funded ambulance service) was perjurious. With respect to that testimony, Freitag claims her testimony was literally true, even if it was misleading. See Bronston v. United States, 409 U.S. 352 (1973). However, this cannot be squared with the trial transcript where Freitag's account of when she asked for the doctor's letters is in direct conflict with the testimony of the person she claims to have called at the doctor's office. The district court did not commit clear error in finding that Freitag perjured herself in giving this testimony. As there are sufficient grounds for the district

court's obstruction of justice determination, we affirm that determination.


III


   For the foregoing reasons, we AFFIRM Freitag's convictions and sentence.



/1 The government's fraud accusation centered on seven Medicare beneficiaries in particular, none of whom testified at trial.

/2 Freitag hired Watson as an office assistant in April 1995. A year later, Freitag hired McLaughlin as an office manager. Before hiring Watson, Freitag handled the billing at FAC.

/3 In submitting electronic claims, a provider is required to use a two-character billing code, "WA" (that is, a "medical necessity modifier"), to convey information about the condition of the patient. The medical necessity modifier indicates that ambulance transportation was medically necessary because the patient was transported under one or more of the following conditions: the patient was immobile because of a fracture or possible fracture; the patient had to be restrained; the patient was unconscious or in shock; the patient had sustained an acute stroke or myocardial infarction; the patient had an accident or acute illness; the patient had sustained severe hemorrhage; the patient could be moved only by stretcher; or the patient was bed-confined before and after the trip.

/4 A "run sheet" is a written record of each patient transport. The ambulance crew completes the run sheet each time a patient is transported, documenting, among other things, the location of the pick-up and the destination, the patient's physical condition, any medical services performed while the patient was in the ambulance, and the reason why an ambulance was needed.

/5 Freitag also mentions a comment by the AUSA conducting the cross-examination about the AUSA's recollection of the testimony of certain government witnesses, but she does not develop any argument based on this comment and therefore has waived any argument that could be made.

/6 Freitag cites two errors each in the amount of $276.32, but she has failed to show how these errors undermine the reasonableness of the initial loss determination given the overall scope

and duration of the fraud scheme.

/7 The government contends that this court should review the adequacy of the district court's findings for plain error because Freitag did not object to the adequacy of the district court's findings below. However, as Freitag points out, when a defendant consistently disputes an issue (as Freitag did here) and the district court does not specifically elicit objections to the adequacy of its findings (as the district court did not here), the defendant does not have to interpose a further objection to the adequacy of a district court's findings after the district court has ruled. United States v. Patel, 131 F.3d 1195, 1201-02 (7th Cir. 1997).

/8 Freitag, for instance, completely denied having a conversation with Watson after they attended a seminar dealing with Medicare fraud. Watson, however, testified that she had a conversation with Freitag on their way home from the seminar. During the conversation, Watson stated that she told Freitag that FAC's billing practices "had to stop" and that Freitag could go to prison for Medicare fraud.