DECISION AND JUDGMENT ENTRY
{¶ 1} Defendant-appellant, Darwin Stigall, appeals the trial court's December 1, 2003 judgment entry which, following a jury trial, sentenced appellant to five years of imprisonment for trafficking in crack cocaine. For the reasons that follow, we affirm the trial court's judgment.
{¶ 2} On February 24, 2003, appellant was indicted on one count of trafficking in crack cocaine, in the vicinity of a school, in violation of R.C. 2925.03(A) and (C)(4)(c). The indictment was based on an appellant's February 7, 2003 alleged crack cocaine sale to an undercover police officer. The indictment charged that the amount of crack cocaine sold was greater than one gram and less than five grams.
{¶ 3} Appellant entered a not guilty plea and the matter proceeded to trial on October 21, 2003. At trial, the state presented the following relevant evidence. Toledo Police Detective Kenneth DeWitt testified that on February 7, 2003, he was working for the vice narcotics unit. DeWitt explained that the vice narcotics unit executes both direct and controlled buys of narcotics. A direct buy is a narcotics buy from a police officer; whereas, a controlled buy is from a civilian or confidential informant. DeWitt testified that officers in the vice narcotics unit or metro drug task force are not subject to the strict grooming code of uniformed officers. DeWitt stated that his appearance at trial: long hair and an earring, help him to blend in and do his job more effectively.
{¶ 4} DeWitt testified that the investigation stemmed from information of drug sales involving individuals living at 21 East Pearl Street in Toledo, Ohio. DeWitt, the lead investigator on the case, testified that on February 7, 2003, at approximately 9:00 p.m., he contacted appellant at 21 East Pearl and arranged to buy an "eight ball," or an eighth of an ounce of crack cocaine. The parties arranged to meet, in 20 to 30 minutes, in east Toledo in front of Wags Party Store at the corner of Starr Avenue and Walden Street. DeWitt told the individual that he would be driving a black Concorde and would be parked across from Wags. According to DeWitt, the individual told him that he would be driving a black "Thunderbird type" vehicle.
{¶ 5} In addition to DeWitt, four other officers were involved in the investigation. DeWitt's supervisor, Sergeant Vasquez, conducted surveillance of DeWitt, Detective Alex Shaller monitored the "wire" or microphone on DeWitt, and Detectives Higgins and Renz monitored 21 East Pearl and the suspect.
{¶ 6} DeWitt testified that he arrived at the designated location and waited for the individual to arrive. The vehicle in question had been followed from 21 East Pearl by Detectives Higgins and Renz. When it arrived at Wags, a black male exited the passenger side and walked into the store. DeWitt testified that although it was dark outside, the area was illuminated by a streetlight and the front of the store was well lit.
{¶ 7} Dewitt stated that he contacted the individual by cell phone; DeWitt questioned him as to his location and the individual stated that he was in the store. The individual walked out of the store, cell phone in hand, and hung up the cell phone as he approached DeWitt's vehicle. The individual got in the passenger's side of the vehicle; he was wearing a hooded sweatshirt and as soon as he sat down he removed the hood.
{¶ 8} The individual pulled out a plastic bag with a chunky white substance, DeWitt testified that based on his training and experience it appeared to be crack cocaine. DeWitt gave the individual $140 which is the general price for an eight ball (about 3.5 grams.) DeWitt testified that at that point, he recognized the individual and was able to identify him. DeWitt identified appellant as the individual who sold him crack cocaine. DeWitt further testified that the transaction took place in the vicinity of a school.
{¶ 9} DeWitt stated that following the transaction, he allowed the individual to leave and that the currency used in the transaction was not marked. DeWitt explained that the officers had received information that there were possibly more narcotics at the East Pearl location and did not wish to jeopardize the investigation. The direct buy would be sufficient probable cause for a search warrant.
{¶ 10} DeWitt conducted a field test on the substance and it tested positive for cocaine. DeWitt then explained police procedure for sending suspected narcotics to the lab for analysis. DeWitt stated that they seal up the substance, place an evidence tag on it with the date, possible suspects and the charge and log it under the "RB" or records bureau number. Following testing, a form is returned with the results of the lab's analysis.
{¶ 11} DeWitt arrested appellant on February 15, 2003, during the execution of a search warrant at 21 East Pearl Street. DeWitt testified that the vehicle used to deliver the drugs was present at the house.
{¶ 12} During cross-examination, DeWitt acknowledged that he did not keep the cell phone number that he called to reach the individual he believed was named "Darwin." DeWitt admitted that although the officers did not record the "wire" statements, they had the ability to do so. DeWitt explained that they did not record the transaction because it was a direct buy. DeWitt also admitted that they did not record the license plate number of the vehicle involved in the transaction. Dewitt testified that on October 20 and 27, 1998, he arrested appellant for two different drug offenses.
{¶ 13} Regarding the February 15, 2003 search and arrest, DeWitt testified that he took appellant into a bedroom, Mirandized him, and asked him if there was anything he wanted to tell DeWitt prior to the search. DeWitt stated that he was wearing a mask at the time. DeWitt did admit that the search failed to uncover a large quantity of drugs and that appellant was arrested based solely on the February 7, 2003 incident.
{¶ 14} On redirect, DeWitt testified that when he arrested appellant in 1998, he had short hair, no earrings, and no facial hair. DeWitt answered affirmatively when asked whether he ever bought narcotics from the same person and, subsequently, bought from the same person again. On recross examination, DeWitt clarified that, on more than one occasion, he has arrested an individual following a drug sale and that same individual again sold him drugs.
{¶ 15} Next, Detective Al Higgins testified that on February 7, 2003, he and Detective Renz conducted surveillance at 21 East Pearl Street. Higgins testified that he and Renz were parked approximately four to six houses away in an unmarked vehicle. Higgins observed a black male and a white female leave the house and drive away in a black Trans Am. Higgins admitted that he was unable to identify appellant. The officers followed the vehicle to the Starr and Walden location where Detective DeWitt was waiting and continued surveillance from an alley running parallel to Starr Avenue. Higgins and Renz remained in the alley until the sale was complete. During cross-examination, Higgins testified that he could not recall whether he obtained the license plate number of the black Trans Am.
{¶ 16} On February 7, 2003, Detective Alex Shaller testified that he was in an unmarked police surveillance van parked across the street from the front of Wags Party Store. Shaller testified that he was monitoring the wire worn by Detective DeWitt. Schaller admitted that the equipment had recording capabilities but, because it was a direct buy, it was unnecessary. Shaller stated that he monitored the transaction mainly for DeWitt's safety.
{¶ 17} Shaller testified that he observed a black Firebird pull up and park. An individual got out of the car and entered the store. Shortly thereafter, the individual left the store and entered DeWitt's vehicle. Schaller stated that he was parked approximately 60-70 feet from DeWitt and that there were lights on in the store and that the front of the store was lit. Shaller was able to see the individual's face and identified appellant.
{¶ 18} Shaller followed the individual out of the area, to a gas station, and then back to 21 East Pearl Street. Shaller testified that the individual they arrested on February 15, 2003, was the same individual that got into Detective DeWitt's vehicle.
{¶ 19} Schaller was cross-examined on his identification of appellant. Schaller testified that he could not identify the individual when he entered DeWitt's vehicle, but was able to identify him after he exited the vehicle. He also described what the individual was wearing.
{¶ 20} Sergeant Lou Vasquez testified that on February 7, 2003, he was the night supervisor of the vice narcotics unit. Vasquez testified that he conducted surveillance of the drug buy and, from his vantage point, he could see the back of DeWitt's vehicle. Vasquez observed a black Trans Am or Firebird pull up. An individual got out of the car and went into the party store; he exited the store and got into DeWitt's vehicle. Vasquez stated that the individual was in the car two or three minutes, exited, then got back in the black vehicle and left the area.
{¶ 21} During cross-examination, Vasquez testified that he was not able to identify appellant as the individual who sold DeWitt the narcotics. Vasquez indicated that the individual was a black male and was wearing a dark hooded sweatshirt.
{¶ 22} Toledo Police Detective Chad Culpert testified regarding the factor that the offense was committed in the vicinity of a school. Culpert testified that on April 25, 2003, he measured the distance from the intersection at Starr and Walden to Franklin Elementary School, located at Starr and Oak. Using a rolling measuring stick, Culpert measured from the farthest point of the intersection, westbound down Starr Avenue, on to the Franklin Elementary property. The measurement totaled 450 feet.
{¶ 23} The state's final witness was Chadwyck Douglass, a criminalist who primarily analyzes narcotics and drug evidence. Douglass testified regarding the three tests used to analyze cocaine. Douglass stated that the first two tests are not conclusive, but point to whether or not the substance is cocaine. The third test is a confirmatory infrared light test.
{¶ 24} Douglass testified that he was asked to perform an analysis on suspected drugs in this case. Douglass stated that he performed the three tests and, based on the results, concluded that the substance was crack cocaine. Douglass testified that the substance weighed 3.08 grams.
{¶ 25} During cross-examination, Douglass was questioned regarding the chain of custody safeguards in place to ensure that the analyzed substance was the substance sold to Detective DeWitt on February 7, 2003. Douglass testified that only a limited number of suspected narcotics are in the lab at one time and, once an analysis is completed, the substance is promptly returned to the property room. Douglass further testified that prior to testing an item, he confirms that the RB number on the evidence tag, which includes the suspect's name and date when the suspect was found with the suspected narcotics, with the number on the written request.
{¶ 26} Appellant testified on his own behalf. Appellant testified that he did not live at 21 East Pearl Street, but he visited friends that lived there and had occasionally stayed overnight. Appellant stated that on February 7, 2003, he did not deliver drugs to Detective DeWitt.
{¶ 27} Appellant testified that in 1998, he was arrested by Detective DeWitt on two separate occasions; each time, DeWitt read him his Miranda rights. Appellant agreed that DeWitt had changed his appearance since then, his hair was longer. Appellant testified that he would have recognized DeWitt five years later, even with his altered appearance.
{¶ 28} Regarding the February 15, 2003 search and appellant's arrest, appellant testified that DeWitt, wearing a mask, took him into a bedroom and requested that appellant tell him where the drugs were located. Appellant testified that even with the mask on, he identified DeWitt as the officer. Appellant, despite his denials, was arrested for selling DeWitt crack cocaine on February 7, 2003.
{¶ 29} Appellant testified that he and his girlfriend took photographs of the area where the alleged drug transaction occurred. Appellant indicated that the lighting in the area was not very good; the photographs were ultimately admitted into evidence.
{¶ 30} During cross-examination, appellant admitted that he entered pleas to the charges stemming from appellant's 1998 arrests. As to these arrests, appellant testified that DeWitt had a mask on during the first arrest but removed it during the second arrest. Appellant denied seeing DeWitt on February 7, 2003.
{¶ 31} Following the conclusion of the testimony, the jury found appellant guilty. This appeal followed and appellant now raises the following three assignments of error:
{¶ 32} "I. The jury verdict was against the manifest weight of the evidence because the evidence demonstrated that appellant was identified by his past association with the detective in charge of the investigation.
{¶ 33} "II. The trial court erred in failing to instruct the jury on a lesser included offense of drug abuse.
{¶ 34} "III. Appellant was deprived of his right to a fair and impartial trial as evidenced by the court's bias both prior to trial and at sentencing."
{¶ 35} In his first assignment of error appellant contends that the jury's verdict was not supported by the weight of the evidence. "Weight of the evidence" refers to the jury's resolution of conflicting testimony. State v. Thompkins (1997),78 Ohio St.3d 380, 387. In determining whether a verdict is against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id.
{¶ 36} In this case, appellant argues that the evidence presented at trial clearly demonstrates that Detective DeWitt identified appellant based upon their prior unrelated association. DeWitt testified that on February 7, 2003, he recognized appellant and was able to identify him. Detective Shaller, uninvolved in the prior arrests, also identified appellant. Appellant testified that had he entered DeWitt's vehicle on February 7, 2003, he would have recognized him despite his altered appearance. It is well established that the credibility of witnesses is primarily for the trier of fact to decide. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus; State v. Harriston (1989),63 Ohio App.3d 58, 63. Thus, we cannot say that the jury lost its way or created a "manifest miscarriage of justice" in finding that appellant did, in fact, sell cocaine to DeWitt on February 7, 2003.
{¶ 37} Appellant further contends that a juror "lost his way" because he was unable to stay awake during portions of the trial. We first note that "a trial court `has considerable discretion in deciding how to handle a sleeping juror.'" State v. Sanders
(2001), 92 Ohio St.3d 245, 253, quoting United States v.Freitag (C.A. 7, 2000), 230 F.3d 1019, 1023. In this case, the matter was brought to the court's attention and the judge acknowledged that the juror, at times, was not alert. The judge questioned the juror and he indicated that he was able to hear all of the testimony and understood all the evidence offered by the parties. The judge then allowed the juror to remain. Based on the foregoing, we find that the court did not abuse its discretion by failing to remove the juror. Appellant's first assignment of error is not well-taken.
{¶ 38} In his second assignment of error, appellant argues the court erred in failing to instruct the jury on the lesser included offense of drug abuse. Appellant correctly states that a two-step process is employed to determine whether a jury instruction on a lesser included offense is warranted:
{¶ 39} "First, the trial court `must determine what constitutes a lesser included offense of the charged crime; second, it must examine the facts and ascertain whether the jury could reasonably conclude that the evidence supports a conviction for a lesser offense and not the greater.' State v. Kidder (1987),32 Ohio St.3d 279, 280, 513 N.E.2d 311. In State v. Thomas (1988),40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus, the Supreme Court of Ohio noted that a charge on a lesser included offense is required `only where the evidence presentedat trial would reasonably support both an acquittal on the crimecharged and a conviction upon the lesser included offense.
(Emphasis added.)'" State v. Townsend, 6th Dist. No. L-00-1290, 2002-Ohio-2289, at ¶ 42, reversed on other grounds100 Ohio St.3d 246, 2003-Ohio-5758.
{¶ 40} In State v. Smith (Dec. 23, 1997), 10th Dist. No. 97APA05-660, involving the denial of a request for a drug abuse instruction in a drug trafficking case, the court found that the trial court did not err in refusing to give the instruction where the appellant's defense was not that the bag he dropped contained a substance in addition to cocaine; rather, the appellant argued that he was not the person chased by the police officer and did not drop the bag. Id.
{¶ 41} Similarly, in this case, if appellant's version of the facts were to be believed, then he was entitled to an acquittal. If the state's version of the facts were to be believed, a conviction for drug trafficking was warranted. Thus the evidence presented did not support both an acquittal on the crime charged and a conviction on a lesser included offense. Id. See State v.Wilkins (1980), 64 Ohio St.2d 382, 388. Appellant's second assignment of error is not well-taken.
{¶ 42} Appellant asserts in his third and final assignment of error that the trial court's bias deprived him of his right to a fair trial. In particular, appellant contends that the court, displeased that appellant would not accept a plea, stated that if appellant were found guilty he would be sentenced to five years of imprisonment. Appellant further asserts that at sentencing, the court demonstrated a predetermined bias to sentence him to the maximum prison term. At appellant's November 21, 2003 sentencing hearing, the court stated:
{¶ 43} "We had the trial, made the findings. We all know the direction this is going in. This was no hide-and-go-seek. I mean, ten felonies, 15 misdemeanors, he's been around the system, those are prior offenses, so we all knew, I think, what was going to happen if they found him guilty. I don't think there was much question about it.
{¶ 44} "I mean, it's not personal with me, I don't — I know who Danny Navarre is. Any of that involvement, I don't know. I know what was brought into the courtroom, I know what the evidence was, and I know what the jury said. I know he's got a sheet that's bad, he's going down for the full time. I mean, there ain't no way around it, I don't think that's any surprise to anybody, I just can't do it."
{¶ 45} Appellant cites State v. Laing (Dec. 2, 1999), 8th Dist. No. 73927, to support his argument that the court exhibited bias against appellant based upon his refusal to accept a plea. In Laing, the court, as in this case, informed the defendant that if he pled guilty he would receive an 18-month sentence but, if he went to trial and was found guilty, he would be sentenced to 5 years. However, in Laing the statement was not an isolated incident. During the jury trial, the court improperly vouched for the credibility of the police officers that testified, communicated his opinion of the case to the jury, and repeatedly reprimanded and admonished defense counsel in front of the jury. Id. Based on the "cumulative effect" of the court's actions, the appellate court reversed the conviction. Id.
{¶ 46} In this case, the first comment was made prior to trial. At sentencing, the court stated that, based on the testimony presented at trial and appellant's prior criminal history, the court had no choice but to sentence appellant to the maximum sentence. Appellant has not demonstrated how he was prejudiced from having a fair trial and this court finds no evidence of prejudice. Thus, appellant's third assignment of error is not well-taken.
{¶ 47} Based on the foregoing, we find that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, appellant is assessed the court costs in this matter.
Judgment affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J., Pietrykowski, J. and Parish, J. concur.