**Opinion issued June 29, 2023**



In The

# Court of Appeals

### For The

# First District of Texas

———————————

### NO. 01-21-00281-CR

———————————

## MACK WATSON JR., Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

### On Appeal from the 263rd District Court
### Harris County, Texas
### Trial Court Case No. 1520070

---

### MEMORANDUM OPINION[1]

Appellant Mack Watson, Jr. appeals his conviction for murder. TEX. PENAL

CODE § 19.02(b). In three issues, Watson contends the trial court erred by: (1)

denying his motion to suppress an in-court identification of him as the shooter; (2)

---

[1]     Do Not Publish. TEX. R. APP. P. 47.2(b).

denying a motion to suppress Watson's recorded statement to police; and (3) not excusing a yawning juror. We affirm.

## Background

One evening in August 2016, Tyrone Scyrus was working on his car in his driveway on Kenny Street. His neighbor was playing kickball with his family when he heard gunshots. The neighbor observed Tyrone running away from another black male. Tyrone jumped a ditch, fell to the ground, and was shot in the back of the head by the second man. The shooter then ran back across the street, got into a silver Impala, and left the neighborhood.

Tyrone's girlfriend, Lourdes Peña, was inside their home when the shooting occurred. After she heard "three pops" that sounded like fireworks, she looked out the front door and observed a black female standing next to a silver Impala. She then saw a black male, wearing a white muscle shirt and dark shorts, running toward the Impala. Peña observed the black male get into the driver's seat and drive off with the female inside the vehicle.

Tyrone's son, Trey, and Tyrone's friend, Jason, were also at Tyrone's house at the time of the murder. Trey was inside when the shooting occurred. After he heard gunshots, Trey looked out the window and saw a man with dreadlocks, a white T-shirt, and a dark blue bandana around his mouth running toward his dad.

He looked out another window and saw a man and woman get into a grey car and drive away.

At the time of the murder, Jason was outside with Tyrone. The shooter also shot Jason, but he survived. Jason described the shooter as a tall, muscular, black male, wearing a white shirt, dark pants, and a mask.

Shortly thereafter, Deputy Terry Tolleson stopped Watson nearby as he was driving his silver Impala. Unrelated to the shooting, a 911 caller had reported a black man and woman breaking into a silver Impala at a nearby motel.[2] Before stopping Watson, Tolleson confirmed that Watson's license plate closely matched the plate number provided by the 911 caller. While Deputy Tolleson was attempting to handcuff Watson, the passenger, Laday, fled the scene. As she ran, Laday shot a tow truck driver who attempted to pursue her. Officers apprehended Laday shortly thereafter.

After Watson consented to a search of his vehicle, officers located a black ski mask and a bandana inside the Impala, items that witnesses said the shooter was wearing at the time of Tyrone's murder. Officers also determined that Watson's clothing and physical appearance fit the descriptions given by witnesses at the Kenny Street scene. Watson agreed to accompany officers to the police

---

[2]   Watson informed officers during the traffic stop that he was the man the caller described. Watson and Cormeshia Laday had been staying at the motel, and he locked his keys in the car. He attempted for several minutes to break into his vehicle before shooting off the door handle and gaining entry.

station for an interview. Following the interview, police drove Watson back to the motel where he had been staying. Peña was shown a photo array on two separate occasions within days of the shooting. After Peña identified Watson in the array, officers obtained a warrant for Watson's arrest.

Following trial, the jury convicted Watson of murder. After finding one enhancement paragraph true, the trial court assessed punishment at forty years' confinement. Watson appeals.

## In-Court Identification

In his first issue, Watson argues the trial court erred in denying his motion to suppress Peña's in-court identification of him as the shooter because it was based on an impermissibly suggestive pretrial photo array procedure, which thus gave rise to a substantial likelihood of misidentification at trial.

### A. Standard of Review

We review a trial court's decision on a motion to suppress identification under an abuse of discretion standard. *See Villareal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). Under this standard, we give almost total deference to a trial court's determination of historical facts supported by the record, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor of witnesses. *Loserth v. State*, 963 S.W.2d 770, 772 (Tex. Crim. App. 1998). We give the same amount of deference to the trial court's rulings on

"application of law to fact questions," also known as "mixed questions of law and fact," if the resolution of those questions turns on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (internal quotations omitted). We review de novo "mixed questions of law and fact" that do not fall within this category. *Id.* When, as in this case, there are no written findings of fact in the record, we uphold the trial court's ruling on any theory of law applicable to the case and presume the trial court made implicit findings of fact in support of its ruling so long as those findings are supported by the record. *State v. Ross,* 32 S.W.3d 853, 855–56 (Tex. Crim. App. 2000).

When faced with a challenge to an out-of-court identification, a trial court must look to the totality of the circumstances surrounding the identification to determine if a procedure was so unnecessarily suggestive and conducive to irreparable mistaken identification that the defendant was denied due process of law. *See Webb v. State*, 760 S.W.2d 263, 272 (Tex. Crim. App. 1998). In the first step of this analysis, the trial court determines whether the identification procedure was impermissibly suggestive. *Barley v. State*, 906 S.W.2d 27, 33–34 (Tex. Crim. App. 1995). If the trial court determines that the identification is impermissibly suggestive, the court must then consider the factors enumerated in *Neil v. Biggers* to determine whether the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. *See id;* 409 U.S. 188 (1972). Throughout this

process, the burden is on the movant to show impermissible suggestion and substantial likelihood of misidentification by clear and convincing evidence. *See Barley*, 906 S.W.2d at 33–34.

## B.    Analysis

Watson must first show that the procedure used to obtain Peña's identification was impermissibly suggestive. Suggestiveness may be created by the manner the pretrial identification procedure is conducted. *Id.* at 33. For example, police may point out the suspect or suggest that a suspect is included in the lineup or photo array. *Id.* The content of the lineup or array itself may also show suggestiveness if the suspect is the only individual who closely resembles the pre-procedure description. *Id.* Furthermore, we must assess whether an individual procedure wase suggestive or whether the cumulative effect of the procedures was suggestive. *Id.*

On appeal, Watson contends the photo array was impermissibly suggestive because (1) no one described the shooter as bald, but the array included all bald men; and (2) Peña described the shooter as having a "bushy" beard and Watson's photo was the only one depicting an individual with a "bushy" beard.

As to Watson's first argument, we disagree with his contention that "none of the witnesses described the shooter as bald." In fact, Tyrone's neighbor testified that he did not see any hair on the shooter's head and told officers at the scene that

6

the man could have been bald. Thus, the inclusion of all bald men in the array does not demonstrate that the identification procedure was somehow tainted or impermissibly suggestive. While "[a] lineup is considered unduly suggestive if other participants are *greatly* dissimilar in appearance from the suspect," here, all photographs depicted similarly bald, black males with facial hair. *See Withers v. State*, 902 S.W.2d 122, 125 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (emphasis in original). We are likewise unpersuaded by Watson's second argument concerning the amount of facial hair on the men in the photo array. Each photo showed a man with some type of facial hair, and because of shadows in the photographs, more than one man appears to have a beard. *See id.* (holding that "[m]inor discrepancies between lineup participants will not render a lineup unduly suggestive").

Neither of Watson's arguments demonstrate that the photo array was impermissibly suggestive. *See Hasker v. State*, 725 S.W.2d 443, 445 (Tex. App.—Houston [1st Dist.] 1987, no pet.) (holding that photo array was not impermissibly suggestive where witness described suspect as having a mustache, and several men in the array had facial hair resembling a mustache); *Davis v. State*, 649 S.W.2d 380, 382 (Tex. App.—Fort Worth 1983, pet. ref'd) (lineup not impermissibly suggestive where suspect described as having a little mustache and peach fuzz, but lineup photo showed a man with a full beard and afro haircut). As the Court of

7

Criminal Appeals has explained in this context, "it is not essential that all the individuals be identical and neither due process nor common sense requires such exactitude." *Hasker*, 725 S.W.2d at 445 (discussing *Buxton v. State*, 699 S.W.2d 212, 216 (Tex. Crim. App. 1985)); *see also Turner v. State*, 600 S.W.2d 927, 932 (Tex. Crim. App. [Panel Op.] 1980) (lineup consisting of five persons, two of whom had beards and were not physically close to appellant in size and hair color, was not impermissibly suggestive).

Having determined that the pretrial photo array was not impermissibly suggestive, we need not address the second prong of the analysis, i.e., whether under the circumstances it created a substantial likelihood of misidentification. *See Barley*, 906 S.W.2d at 34.

We also conclude that even if the pretrial identification procedures were unduly suggestive, any error in the admission of Peña's in-court identification of Watson was harmless because, as the State correctly points out, Laday also positively identified Watson in court as the shooter, and Watson does not challenge her identification of him on appeal. *See Williams v. State*, 402 S.W.3d 425, 432 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (holding it was harmless error to permit in-court identification, despite pretrial identification procedures, because other witness positively identified appellant as shooter in court); *Williams v. State*, 477 S.W.2d 885, 888 (Tex. Crim. App. 1972) (concluding it was harmless error to

allow in-court identification, despite potentially invalid pretrial lineup, where two other witnesses identified appellant as the perpetrator, and appellant did not challenge either of those identifications). We overrule Watson's first point of error.

## Watson's Statement to Police

In his second issue, Watson argues that the trial court should have suppressed the statements he gave to police following the murder because he was effectively in custody at the time the statement was made, but officers did not read him the *Miranda*[3] warnings. On appeal, Watson does not challenge the admission of any specific statements; however, at trial, he argued that the entirety of his statement to Detective Michael Ritchie should be suppressed.

### A. Standard of Review

We review a trial court's denial of a motion to suppress statements under a bifurcated standard. *In re J.J.*, 651 S.W.3d 385, 389 (Tex. App.—Houston [1st Dist.] 2022, pet. denied) (en banc). A trial court's ultimate "custody" determination "presents a 'mixed question of law and fact.'" *Herrera v. State,* 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112–13 (1995)). Therefore, we afford almost total deference to a trial court's "custody" determination when the questions of historical fact turn on credibility and demeanor. *Herrera*, 241 S.W.3d at 527. Conversely, when the questions of

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

historical fact do not turn on credibility and demeanor, we will review a trial judge's "custody" determination de novo. *Id.* Again, because the trial court denied the motion to suppress without entering any findings of fact, we view the evidence in the light most favorable to the ruling and assume the trial court made implicit findings of fact that support its ruling if those findings are supported by the record. *Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021). The party that prevailed in the trial court is afforded the strongest legitimate view of the evidence, and all reasonable inferences that may be drawn from that evidence. *Id.*

**B.** *Miranda* **and Article 38.22**

*Miranda* and article 38.22 of the Texas Code of Criminal Procedure deem statements produced by custodial interrogation to be inadmissible unless the accused is first warned that he has the right to remain silent, his statement may be used against him, and he has the right to hire a lawyer or have a lawyer appointed. *Miranda*, 384 U.S. at 479; TEX. CODE CRIM. PROC. art. 38.22. In addition, article 38.22 requires a warning that the accused has the right to terminate the interview at any time. *Herrera*, 241 S.W.3d at 526. The warnings are required only when there is custodial interrogation. *Id.*

A custody determination requires two inquiries: (1) the circumstances surrounding the interrogation, and (2) whether a reasonable person in those circumstances would have felt that she was not free to leave. *Thompson*, 516 U.S.

10

at 112. "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test" to determine whether there was restraint on freedom of movement of a degree associated with arrest. *Id.* The ultimate inquiry is whether, under the circumstances, a reasonable person would have believed that her freedom of movement was restricted to the degree associated with a formal arrest. *See Stansbury v. California*, 511 U.S. 318, 322 (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). The "reasonable person" standard presupposes an innocent person. *Dowthitt*, 931 S.W.2d at 254 (citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991)).

Although the United States Supreme Court has held that a traffic stop does not generally constitute "custody" for *Miranda* purposes, "subsequent events may cause a noncustodial encounter to escalate into custodial interrogation." *State v. Stevenson*, 958 S.W.2d 824, 828 (Tex. Crim. App. 1997) (citing *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984), and *Dowthitt*, 931 S.W.2d at 254–55). *Dowthitt* outlined four general situations that may constitute custody: (1) the suspect is physically deprived of his freedom of action in any significant way, (2) a law enforcement officer tells the suspect that he cannot leave, (3) law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, or (4) there is probable

cause to arrest, and law enforcement officers do not tell the suspect that he is free to leave. 931 S.W.2d at 255.

For the first three situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Id.* For the fourth situation, the officer's knowledge of probable cause must be manifested to the suspect, and custody is established only if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe she is under restraint to a degree associated with an arrest. *Id.*; *Stansbury*, 511 U.S. at 325. An officer's subjective intent to arrest the suspect is irrelevant unless that intent is communicated or otherwise manifested to the suspect. *Dowthitt*, 931 S.W.2d at 254 (citing *Stansbury*, 511 U.S. at 324–25 (police knowledge or beliefs bear on the custody issue only if they are conveyed to the suspect)).

To evaluate whether a reasonable person in the suspect's situation would have felt that there was a restraint on his freedom to a degree associated with arrest, the record must establish the circumstances manifested to and experienced by him. *State v. Ortiz*, 382 S.W.3d 367, 373 (Tex. Crim. App. 2012) ("only the objective circumstances known to the detainee should be considered in deciding what a reasonable person in his position would believe."). *See also Thompson*, 516 U.S. at 113 ("if encountered by a 'reasonable person,' would the identified

circumstances add up to custody"); *Berkemer*, 468 U.S. at 442 ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.").

**C.    Analysis**

Admittedly, Detective Ritchie did not give Watson any *Miranda* warnings before recording his statement. Therefore, we only need to decide if Watson was in custody at the time that he gave his statement to determine the admissibility of the statement. *See Herrera*, 241 S.W.3d at 526. If Watson was in custody, the warnings were required, and denying the motion to suppress was erroneous. *See id.* Because the determination of custody requires the application of law to the facts, we review the trial court's determination de novo. *Guzman*, 955 S.W.2d at 89.

Watson argues that the third *Dowthitt* scenario applies here—that officers created a situation that would lead a reasonable person to believe that his freedom of movement had been significantly restricted. It is undisputed that Watson was at least detained during the time that he was handcuffed in the back of the patrol car during the traffic stop. Officers acknowledged as much to Watson at various stages of the roadside investigation. "Both detention and arrest involve a restraint on one's freedom of movement; the difference is in the degree." *Ortiz v. State*, 421 S.W.3d 887, 890 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). When called upon to make that determination, courts examine several factors, including

13

the amount of force displayed, the duration of a detention, the efficiency of the investigative process and whether it is conducted at the original location or the person is transported to another location, the officer's expressed intent–that is, whether he told the detained person that he was under arrest or was being detained only for a temporary investigation, and any other relevant factors.

*State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008).

The State urges us to consider the chaotic nature of the events on the night in question when evaluating the amount of force displayed at the traffic stop. Deputy Tolleson stopped Watson's vehicle based on the reported theft of a silver Impala. Knowing that the individual seen breaking into the Impala had a gun, he conducted a felony stop[4]. While attempting to secure Watson and Laday, Laday fled the scene. Shortly thereafter, shots were fired, and the tow truck driver ran to Tolleson with a gunshot wound, reporting Laday had shot him. Tolleson was without backup at the time. Considering this, it was not unreasonable for Deputy Tolleson to keep Watson in the patrol car in handcuffs, for both his and Watson's safety. This display of force did not transform the investigative detention into an arrest. *See id.* at 290 (concluding officer's handcuffing of defendant was temporary detention, not an arrest, because it was done, in part, to enable officer to make

---

[4] At trial, Tolleson explained that a felony stop is a high-risk traffic stop used in situations where the officer has information that the person may be armed or a threat to officers or civilians. Instead of approaching the vehicle, Tolleson used his loudspeaker to give instructions to Watson, and only got out of the police car once Watson was kneeling on the ground with his hands in the air.

14

protective sweep of scene); *Rhodes v. State*, 945 S.W. 2d 115, 117–18 (Tex. Crim. App. 1997) (holding that removing suspect from car, handcuffing him, and walking him back to patrol car was reasonable to protect officer safety and did not constitute an arrest); *Hauer v. State*, 466 S.W.3d 886, 891–92 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (determining that appellant was not in custody for purposes of *Miranda*, even though officer handcuffed him and placed him in patrol car during DWI investigation; court noted officer was alone at scene and waiting for backup to assist with investigation); *Mount v. State*, 217 S.W.3d 716, 726–27 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding no arrest where officers drew weapons for safety reasons during felony stop of possibly stolen vehicle).

Watson points to the length of the traffic stop, roughly four and a half hours, as a basis for determining he was in custody. Watson was handcuffed for approximately four hours during the stop. While we acknowledge that this is not an insignificant length of time, we note that Watson has never argued, either here or below, that any statements made during this period should have been suppressed. Rather, he only argues that his statements to Detective Ritchie, made after handcuffs were removed and his freedom of movement was far less restricted, should have been suppressed. Watson went to the police station for the interview voluntarily. Before he agreed to go, Watson asked Officer Cook whether he could

15

say no, and Cook acknowledged that he could. Cook also confirmed that Watson was not being charged at that time. While en route to the station with Deputy Tolleson, Tolleson reiterated that Watson was detained but not under arrest. At the station, Detective Ritchie told Watson on more than one occasion that he was "not in custody" and "[t]here voluntarily." He was allowed to purchase a drink and a snack and was not handcuffed during the interview.

Given these facts, the case of *Maxwell v. State*, No. 01-00-00708-CR, 2002 WL 356530 (Tex. App.—Houston [1st Dist.] Mar. 7, 2002, pet. ref'd) (not designated for publication) is most instructive. There, appellant called 911 to report the shooting of his parents at their home. 2002 WL 356530 at *2. After determining appellant was the only witness, officers bagged his hands to preserve them for subsequent testing, secured the bags with handcuffs, and put him in the police car for approximately two hours until testing could be conducted. *Id.* at *2–3. Appellant was not questioned during this period. *Id.* at *2. After testing appellant's hands and removing his handcuffs, officers continued investigating at the scene. *Id.* at *3. No one ever told appellant that he was a suspect or under arrest. *Id.* at *4. A few hours after he was taken out of the handcuffs, appellant gave a recorded statement to police. *Id.* at *3–4. He subsequently agreed to go to the station with police to provide fingerprints and have photos taken. *Id.* at *3. While there, he consented to providing a second, written statement. *Id.* Appellant

16

was given food and drink. *Id.* Officers did not provide *Miranda* warnings because they considered appellant to be a witness, not a suspect. *Id.* The officers did not threaten appellant, promise him leniency, or tell him that he was under arrest. *Id.* at *4. At trial, appellant moved to suppress both statements, and the trial court denied his motion. *Id.* at *1.

On appeal, this court affirmed, concluding that appellant was not in custody at the time either statement was made. *Id.* at *4–5. Regarding the oral statement, the court noted that

> a reasonable person could have believed he was under restraint tantamount to arrest when he was placed in the back of a locked police car for two hours and was handcuffed behind his back for three-quarters of that time, regardless of the officers' subjective intent or standard procedure. However, the officers did not then interrogate appellant. Rather, the evidence supporting the judge's ruling shows that, at the end of this two hours, [the detective] told appellant he was a witness; the handcuffs were removed for good; the car door was left open for most of the time; and appellant sometimes walked around with the officers. No one ever told appellant he was a suspect or was under arrest. It was at this point that appellant gave his oral statement. A reasonable person would not have believed he was then restrained to the extent of being arrested.

*Id.* at *4. Similarly, here, Watson's cuffs "were removed for good" after approximately four hours. At that point, he consented to a ride to the station for further questioning. Before going, Watson confirmed that he understood doing so was optional. Likewise, officers did not threaten or coerce Watson to go to the

station or give a statement. *See Anderson v. State*, 932 S.W.2d 502, 505 (Tex. Crim. App. 1996) (one who voluntarily accompanies officer to police station upon request, whether doing so for the investigation or to exonerate himself, is not in custody if circumstances show there were no express or implied threats of being taken forcibly); *Ogg v. State*, No. 14-18-01028-CR, 2020 WL 1855286, at *4–5 (Tex. App.—Houston [14th Dist.] Apr. 14, 2020, no pet.) (mem. op., not designated for publication) ("Generally, when a person voluntarily accompanies law enforcement to a certain location, even though he knows or should know that law enforcement suspects that he may have committed or may be implicated in committing a crime, that person is not restrained or 'in custody.'").

Officers never told Watson he was a suspect or was under arrest. In fact, Ritchie reminded Watson that he was "[t]here voluntarily," "not in custody," and "free to go." Further, at the station, Watson bought a snack and a drink, and appeared eager to assist with the investigation. Watson repeatedly offered to help Detective Ritchie, not only with information regarding Laday, but also as a confidential informant in future cases. *See Maxwell*, 2002 WL 356530, at *5 (affirming denial of motion to suppress written statement at station where appellant was told he was a witness before going to station, was never told he was a suspect or under arrest, appellant consented to going to the station, no one threatened or enticed appellant to do so, and appellant was eager to help).

At the end of the interview, an officer drove Watson back to the motel where he had been staying. Considering the totality of the circumstances, we determine that the record supports the trial court's conclusion that Watson was not in custody when he made the challenged statements. *See, e.g.*, *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (holding person not in custody when he came voluntarily to police station, was immediately informed he was not under arrest, participated in interview, and left police station without hindrance); *Meek v. State*, 790 S.W.2d 618, 622 (Tex. Crim. App. 1990) (holding person was not in custody when he came to station voluntarily at time of his own choosing, was allowed to step outside building and go unaccompanied to his car during interviews, and "a few hours" later was allowed to leave unhindered after statements were completed); *Nelson v. State*, 405 S.W.3d 113, 129–30 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (concluding defendant was not subjected to custodial interrogation where she met officer at police station, acknowledged in recorded statement that she was there voluntarily and was making statement voluntarily, and officer told defendant he was going to let her go home at end of interview); *Ervin v. State*, 333 S.W.3d 187, 211 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (finding no custody when suspect voluntarily went to station, was told she could leave, was not handcuffed, was at station for four hours, and went home after making

incriminating statements). We affirm the trial court's denial of Watson's motion to suppress.

**D.  Harmless Error**

Even if we were to find that Watson was in custody at the time he gave a recorded statement to Ritchie, and thus, the motion to suppress was erroneously denied, we determine that any error in doing so was harmless. In a criminal case, the erroneous denial of a motion to suppress a statement taken in violation of *Miranda* is constitutional error subject to review under the standard set forth in Texas Rule of Appellate Procedure 44.2(a). *See* TEX. R. APP. P. 44.2(a). Under Rule 44.2(a), "[i]f the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *Id.*

The emphasis of the harm analysis under Rule 44.2(a) should not be on the propriety of the outcome of the trial. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). Specifically, "the question for the reviewing court is not whether the jury verdict was supported by the evidence. Instead, the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict." *Id.* In reaching that decision, we

20

may consider (1) whether the recorded statement was cumulative of other evidence, (2) the importance of the recorded statement to the State's case, (3) the probable weight a juror would place upon the recorded statement, (4) the presence or absence of evidence corroborating or contradicting the recorded statement on material points, and (5) the overall strength of the prosecution's case. *See id.*; *Jones v. State*, 119 S.W.3d 766, 778 (Tex. Crim. App. 2003).

Analyzing the substance of Watson's statement to Ritchie, Watson never admitted any involvement in the murder or otherwise incriminated himself. Throughout the hour-long interview, Watson maintained that he did not make any stops after leaving the motel before he was pulled over. Even when Detective Ritchie told Watson that Laday had confessed to being at the scene, and witnesses observed someone who could fit Watson's description, Watson did not waiver.

The jury found Watson guilty of murder. *See* TEX. PENAL CODE § 19.02(b). Accordingly, to reach its verdict, the jury must have disbelieved Watson's statements to Detective Ritchie and given more weight to the other evidence implicating Watson. *See Foyt v. State*, 602 S.W.3d 23, 45 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (concluding that, "although appellant's falsehoods tend to incriminate him," error in admitting statements was not harmful in light of other evidence); *Olivarez v. State*, No. 14-21-00491-CR, 2023 WL 139224, at *5–6 (Tex. App.—Houston [14th Dist.] Jan. 10, 2023, pet. ref'd) (mem. op., not

21

designated for publication) (citing *Foyt* and determining admission of statement was harmless error where jury obviously disbelieved appellant's statement that shooting was accidental and convicted him of murder). Finding nothing incriminating about Watson's statement to Officer Ritchie, we hold that any error in its admission was harmless. We overrule Watson's second issue.

## Juror Qualifications

In his third issue, Watson argues that the trial court should have removed a juror who was seen yawning at various points during trial. At trial, Watson's attorney alerted the judge to the yawning juror and another who had been seen sleeping at least once. Counsel asked the judge to excuse both jurors, but because doing so would result in a jury of less than twelve, he moved for a mistrial. Following the motion, the court heard testimony from the bailiff concerning both jurors. The trial court ultimately excused the sleeping juror after the bailiff testified that she had awoken that juror on more than one occasion. However, there was no evidence or testimony that the yawning juror ever fell asleep or missed any portion of the trial. The judge did not excuse that juror and overruled Watson's motion.

We have not located, and Watson has not pointed us to, any case law suggesting that yawning alone is enough to disqualify a juror. Further, in the context of a *sleeping* juror, we have stated that "a court is not invariably required to remove sleeping jurors, and a court has considerable discretion in deciding how

to handle a sleeping juror." *Menard v. State*, 193 S.W.3d 55, 60 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (quoting *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000)). The relevant inquiry is "whether the sleeping juror missed large portions of the trial or whether the portions missed were particularly critical." *Menard*, 193 S.W.3d at 60 (internal quotations omitted).

Therefore, we conclude that the trial court's denial of Watson's motion was not an abuse of discretion. *See id.*; *see also Ryser v. State*, 453 S.W.3d 17, 38–39 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (no abuse of discretion in denying mistrial where evidence conflicted as to whether juror was sleeping); *Lee v. State*, No. 01-03-00655-CR, 2004 WL 2903508, at *2–3 (Tex. App.—Houston [1st Dist.] Dec. 16, 2004, pet. ref'd) (mem. op., not designated for publication) (holding that trial court did not abuse its discretion in failing to remove juror who repeatedly nodded off for five-second intervals because juror did not miss large portions of trial). We overrule Watson's third point of error.

## Conclusion

Having overruled all three of Watson's issues, we affirm the judgment of the trial court.

Amparo Guerra
Justice

Panel Consists of Chief Justice Adams and Justices Guerra and Farris.

23