IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 14, 2010 Session

## CHARLES A. WALKER v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40100505     Michael R. Jones, Judge**

**No. M2010-00449-CCA-R3-PC - Filed March 8, 2011**

A Montgomery County jury convicted the Petitioner, Charles A. Walker, of two counts of rape of a child and one count of aggravated sexual battery, and the trial court sentenced him to an effective sentence of twenty-eight years, at 100%, in the Tennessee Department of Correction. The Petitioner appealed his convictions, and this Court affirmed his two rape of a child convictions but reversed and remanded for a new trial the aggravated sexual battery conviction. *State v. Charles A. Walker*, No. M2005-00165-CCA-R3-CD, 2006 WL 3313651, at *1 (Tenn. Crim. App., at Nashville, Nov. 15, 2006), *perm. app. denied* (Tenn. Mar. 12, 2007). The Petitioner filed a petition for post-conviction relief, in which he alleged he received the ineffective assistance of counsel. After a hearing, the post-conviction court dismissed the petition. On appeal, the Petitioner contends that: (1) his trial counsel was ineffective; (2) the prosecutor committed several acts of prosecutorial misconduct at trial; (3) his convictions should be reversed based upon "cumulative error and bias"; and (4) his sentencing was illegal. After careful review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

Kathryn B. Stamey, Clarksville, Tennessee, for the Appellant, Charles A. Walker.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; John W. Carney, Jr., District Attorney General; Arthur F. Bieber, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

## A. Background

This case arises from the Petitioner's sexual interactions with his stepdaughter, who was less than thirteen years old when the offenses occurred. The Petitioner was originally indicted for four counts of rape of a child and two counts of aggravated sexual battery. We summarized the proof presented at trial in our opinion on his direct appeal as follows:

### State's Proof

The victim testified that she was born on September 9, 1988, was currently in the eighth grade, and had lived for the past two years with her father and stepmother in Riverton, Illinois. She said her mother married the defendant in 1998 when she was ten years old, and from 1998 until 2001 she lived with the defendant, her mother, and her younger sister, C.M., at 315 Barkwood Court in Clarksville. The victim testified that the defendant "was making [her] have sex with him" during the time she lived at the Barkwood Court residence. She said the defendant began sometime in 1999 by touching her breasts and vagina over her clothing but then progressed to touching her private parts under her clothing. The victim stated that the inappropriate touching also involved placing her mouth on the defendant's penis and rubbing his penis with her hand. In addition, she said that the defendant penetrated her vagina with his penis on numerous occasions and in various locations throughout the house. The victim testified: "He stuck his penis in my vagina in the living room on the floor and on the couch, and then on the bathroom floor, in his bed, or the hot tub."

The victim said that the intercourse occurred either in the early mornings, after her mother had already left for work and while C.M. was still asleep in her bedroom, or in the afternoons, before her mother or C.M. arrived home. She stated that her mother worked in Nashville and left for work at 5:30 a.m. and returned about 4:00 p.m. During this time period, the defendant was a carpenter and worked "[w]henever he got a call." The victim testified that when she entered middle school, she rode a different school bus from her sister, who was two years younger and in a grade below her in school. The victim said her school bus brought her home approximately thirty minutes before C.M. arrived home.

The victim was unable to remember when the defendant first penetrated her vagina but recalled that the last time occurred in the living room of the Barkwood Court residence on May 28, 2001, when she was twelve years old.

She said she remembered the date because it was within a week of when her father came to pick her up for her summer visitation with him and his wife in Illinois. The victim testified that her mother was at work and her sister was asleep in her bedroom. She stated that the defendant placed a towel on the floor, laid her down on the towel, stuck his penis inside her vagina, and moved up and down until "he told [her] he had come." She said that the defendant did not use a condom and had told her that he "had some kind of surgery so he couldn't make babies." She testified that when the defendant had finished, she covered her vagina with a towel, went to the bathroom, and tossed the towel in the dirty clothes hamper.

When prompted, the victim also recalled that the defendant had penetrated her vagina with his penis in the living room of the residence during the school spring break before her father picked her up for her 2001 summer visitation. Asked what she remembered about that event, she testified: "The week of Spring Break, my Mom would be at work and he [the defendant] would wake me up about 5:30 in the morning and he would make me have intercourse with him and then my sister would be asleep in her bed." The victim said that the intercourse occurred on the living room floor but that a towel was not used. After having her memory refreshed with her prior statement, the victim also recalled that it "was in January" when the defendant first started touching her. When asked what kind of touching occurred at that time, she said that it was touching over her clothing.

The victim testified she was afraid to tell anyone about the abuse because she "thought it was [her] fault and [she] would get yelled at." She stated that her mother eventually found some sexually explicit emails that she and the defendant had been exchanging while she was visiting her father in Illinois. The victim explained that she exchanged the emails with the defendant "[b]ecause of the way he was treating [her] when [she] was with him, and [she] felt that just to make him happy, it would make him do it less and less." She said her mother deleted the emails but told her mother, the victim's maternal grandmother, about them. She said that in response, the victim's grandmother, who lived near the victim's father in Illinois, took the victim to a local park and began berating her:

> When my Mom found out, she told my Grandma and I was up
> with my Dad in Illinois and it was around my sister's birthday,
> July, and my Grandma she picked me up and she said we were
> going to go shopping and she took me to one of the parks there

and she was sitting there, yelling at me, telling me that I was a liar, saying it was all my fault.

The victim testified that the next adults who questioned her about the abuse were her father and stepmother, a police detective she spoke with by telephone, and an Illinois social worker her father took her to see. She said she was scared because she thought it was her fault and she would get into trouble. She also said that she and her mother did not have a good relationship and were not close.

On cross-examination, the victim acknowledged that she told Karen Morelock, the Illinois social worker who interviewed her on July 5 and July 19, 2001, that she thought she was the one who had deleted the emails, that she did not do anything with her mouth to the defendant, and that the sexual touching started in January 2000, as opposed to January 1999 as she stated in her direct examination testimony. At defense counsel's request, the victim read the following portion of her July 19 statement aloud: "I wouldn't do anything with my mouth to him, but he would lick my genital area." She agreed that the following statements in her July 19 statement were true: "It would be everyday beginning in January 2000"; "He would lick me, I had sex with him everyday for over one year"; and "[E]very once in a while, we would have sex one time in the morning and then when I would get home from school." The victim also testified, however, that her statement on direct examination that the abuse began in 1999 was true. She said the defendant first began touching her in January 1999, when she was ten years old and within a few months of his October 1998 marriage to her mother. The victim identified a letter she had written to her father and stepmother stating that she wanted to live with them when she turned thirteen, and she acknowledged that she was frustrated when her mother told her that the decision of where she would live was not solely up to her.

On redirect examination, the victim testified that she did not know how many times she had sexual contact with the defendant from the time she was ten until the last episode that occurred on May 28, 2001. She agreed that there were times when she rubbed the defendant's penis, times when he ejaculated and times when he did not, and times when she touched him with her mouth. She said she could not remember every instance of sexual contact because it did not happen every day. On re-cross examination, she testified that when she told Ms. Morelock that "[i]t would be everyday beginning in January of 2000," she was referring to the sexual touching, not intercourse. She also explained that

-4-

she had told Ms. Morelock that the sexual touching began in January 2000 because she thought 2000 was the year that she was ten.

Detective Alan Charvis of the Clarksville Police Department testified that he was assigned to investigate the case on July 5, 2001, a few days after the defendant's two adult daughters, Cindy Morgan and Althena Walker, reported the defendant to the police. He said he asked Morgan to record her next conversation with the defendant and provided her with a tape recorder but did not tell her what to say. He testified he subpoenaed the records of WebTV, the internet company that provided email service to the defendant's home, but was unable to retrieve any emails between the victim and the defendant. He said that he did not find any emails during his search of the defendant's home or traces of semen in the home, despite using a light source to search the living room carpet, couches, and other surfaces. He testified that his understanding was that there was no computer associated with WebTV and therefore no permanent record of deleted emails. On cross-examination, he acknowledged he made no attempt to search for deleted emails on the hard drive of the computer the victim had used in Illinois.

The defendant's younger daughter, twenty-four-year-old Athena Dawn Walker, testified that the defendant married the victim's mother after his first wife, the witness's mother, passed away in 1996 from brain cancer. She said that on June 30, 2001, she received a telephone call from her older sister, Cindy Morgan, which caused her to go to Morgan's house to discuss something Morgan had heard about the defendant. The next morning, the defendant telephoned her and, without mentioning specifics, began apologizing for what he had done. She said she asked the defendant, "[H]ow long has it been going on?" meaning how long had he been having sexual relations with the victim. She stated that he told her that it had been going on for six or seven months and that he was going to seek counseling.

The witness testified that after her phone conversation with the defendant she went first to her sister's home to discuss the situation further and then to the defendant's home, where she found that neither the defendant nor his wife were willing to talk with her about the issue. The next day, she telephoned the defendant and told him that she thought she needed counseling to handle his revelations. She said the defendant asked her not to see a therapist, telling her that he would be arrested if she spoke about what had happened. She testified the defendant explained to her how he was going to take care of the problem: "He told me that he was going to talk to a therapist

about feelings that he was having, he wasn't going to say that he acted on them, he was just going to try to go get some counseling to try to help him[.]"

The witness testified that when she later called the defendant, he told her he had set up an appointment to see a therapist in three weeks. She said she was upset and told him that she did not want to have to wait three weeks to talk to someone. The defendant repeated that she would cause him to be arrested, and, in the background, she heard the victim's mother yelling that if she talked to a therapist it could cause her to lose custody of her daughters. The witness testified that after hanging up the phone she went directly to her sister's home, where she and her sister decided to go to the police.

On cross-examination, the witness testified that the defendant was a great father, that he never did anything sexually inappropriate to her, her sister, or her friends, and that she had never suspected him of "doing sexually inappropriate things." She acknowledged that she had stayed for a day or two in the Barkwood Court residence, her childhood home, after the defendant married the victim's mother, but the victim's mother "got frustrated" with her, and the defendant asked her to leave. She denied that this had caused a "bad falling out" between her and the defendant. She also acknowledged that the defendant never directly admitted to her that he had engaged in any sexual act with the victim.

The defendant's older daughter, thirty-one-year-old Cynthia Jean Morgan, testified that the defendant called her at the end of June 2001 to tell her that he was in trouble because he had been having sexual relations with the victim and his wife had found out about it. She said the defendant divulged "in a round-about-way" that he had been having sexual relations with the victim, but she did not ask him any detailed questions about what kind of sexual relations he meant. She stated that the defendant told her that his wife had learned about the relationship after intercepting some email and that he feared she was going to turn him in to the authorities. Morgan said that when she told the defendant she thought he deserved to be punished for what he had done, he replied that he would rather die than go to jail.

Morgan testified that she told her sister about the defendant's revelations later that day and that the following day the defendant called to ask her to stop her sister from seeing a counselor. According to Morgan, the defendant was concerned that he would be arrested if either she or her sister talked to a counselor about what he had done. Additionally, during one of her subsequent

telephone conversations with the defendant, she was able to overhear the victim's mother in the background expressing her concern that she would lose custody of her daughters. Morgan said that on July 2 the defendant called her again to tell her that if either she or Athena went to see a counselor, they would deny that anything had happened. She testified that, later that same afternoon, she and Athena discussed the issue and then went to the police station to report the defendant.

Morgan testified that Detective Charvis contacted her a short time later asking if she would tape-record a conversation with the defendant. She said she agreed and on July 5, 2001, called and recorded a conversation with the defendant and his wife. The tape recording of that conversation was admitted as an exhibit and played before the jury. The transcript of the conversation, also admitted as an exhibit, reads in pertinent part:

> CINDY: The other day when we were over there, I asked you if you were gonna get [the victim] help and you said, yes, you would never deny her that but if Athena and I can't even go get help, how's [the victim] gonna get help?
>
> [DEFENDANT]: Not right now. When she get's [sic] older and ask[s] for it. I don't think she'll ask for it right now. You understand what I'm saying.
>
>    . . . .
>
> CINDY: I don't know if a twelve year old knows to ask for help, Dad. She may not realize what your [sic] doing to her is wrong.
>
> [DEFENDANT]: Yes, she does realize that. She does realize that.
>
> CINDY: So she's probably gonna think it[']s okay for her to sleep with [a] 50 year old when she's 15 or 16.
>
> [DEFENDANT]: No. No. No she's not. Cause we've already discussed it here and we're gonna sit down and talk with her.
>
> CINDY: I just don't want her to think all this is her fault.

[DEFENDANT]: I don't either and we're gonna let her know, this is not all her fault. I know that. I don't want her to feel like it's her fault. We're gonna do it right, where she understands what was going on was wrong.

. . . .

CINDY: I just feel like at 29 years old, I need professional help to find out, after finding out that my Dad is a child molester. I can't imagine how a 12 year old would feel. I'm having a hard time.

[DEFENDANT]: Try to take some heart, Cindy, to know that I realize I made a mistake, it's never gonna happen again. It's never gonna happen again. Please try and get some conciliation in that. It will not happen again and I promise you that on my soul.

CINDY: I've just been praying a lot about this.

[DEFENDANT]: I've been praying a lot too. I will be getting back into church, somewhere. I mean I've got a lot of praying yet to do. (pause) But she is not gonna think it is alright [sic]. I mean she's gonna know what we've done is wrong. She already knows but we're gonna reaffirm that.

On cross-examination, Morgan testified that the defendant was a good and loving father to her when she was growing up and that he never did anything sexually inappropriate to her or her friends. She acknowledged she wrote in her statement to police that the defendant had "sexually touched" the victim. She also acknowledged that she would have been upset even if he had merely confessed that he was having sexual feelings toward a twelve-year-old, as opposed to sexual relations. On redirect, however, she testified that she would not have reported him to the police if she had understood him to say only that he had sexual feelings for the victim.

**Defendant's Proof**

The fifty-one-year-old defendant testified that he had lived in the eleven-hundred-square-foot Barkwood Court residence for twenty-seven years;

had been married to his first wife for almost twenty-five years until she passed away on July 21, 1996, from brain cancer; had been honorably discharged from the military in 1972; and had never been in trouble before the allegations arose in the instant case. He said he had always maintained steady employment and had gotten a job at Hobby Lobby after his release from jail following his July 5, 2001, arrest in the case. The defendant also testified that he had been a member of the Hazardous Materials Team for the Montgomery County Emergency Management Agency, delivered meals for Meals on Wheels, had been a volunteer firefighter and had taught numerous classes at the Ashland City Fire Department, and was a member of the Masonic Lodge.

The defendant testified he married the victim's mother on Halloween 1998, and she and her two daughters moved from Illinois to live with him in his Clarksville home. He stated that he had a good relationship with his wife, tried to spend as much time as he could with her and her daughters, and assumed the responsibility of seeing the girls off to school each morning after his wife had departed for work. He said that as time passed and the victim became interested in boys, he began to notice that she was starting to walk around the house wearing only a towel and to dress and undress without closing her bedroom door. He stated that when she persisted in her behavior, despite being told by both himself and his wife that she should stop, he found himself starting to have sexual thoughts about her. The defendant testified that he struggled alone with his improper thoughts for six or seven months until his wife became upset upon finding an email he had sent to the victim in which he told her that he missed her, loved her, and needed her. At that point, he said, he confessed his improper thoughts about the victim to his wife.

The defendant denied that he ever had sexual intercourse with the victim, touched her inappropriately, or exchanged sexually explicit emails with her. He also denied that he told his daughters anything other than he had been experiencing sexual feelings for the victim. The defendant explained that in his taped conversation with Morgan he had been referring to his perception that the victim had been "throwing herself" at him, which was wrong, as were the feelings that he was experiencing toward her as a result of her behavior. He further testified that he was in an automobile accident in 1990 that injured his spinal cord and ultimately rendered him impotent and that he was only able to perform sexually by injecting himself with a prescribed medication that took fifteen to twenty minutes to take effect. He said the only reason he could think of for the victim to fabricate her allegations against him was that she wanted to live with her father, instead of her mother.

On cross-examination, the defendant testified that the victim knew he had had a vasectomy because he had told her about it. He said that he believed his daughters were jealous of the attention he gave his new wife and her daughters. Although he acknowledged that he was a native English speaker, the defendant insisted that the portions of his telephone conversation with Morgan in which he stated that the things he and the victim had "done" were wrong referred to her having walked around partially nude and his having had sexual thoughts about her.

During his subsequent redirect and recross examination testimony, the defendant identified his medical records relating to the treatment of his erectile dysfunction, which were then admitted as an exhibit. The defendant acknowledged that the records reflected there was nothing wrong with his libido. He testified that he could not inject himself with the prescribed medication more than once in a twenty-four-hour period because of the danger of priapism, which was the condition of experiencing an extended erection that required surgery to correct.

Kerri Ann Walker, the victim's mother, testified she had a positive, open relationship with the victim. She described the discussions she had with the victim about puberty, adolescence, and sexuality and said that the victim knew she could talk to her about anything. She testified that the victim never complained to her about the defendant's alleged behavior and that she never saw anything to make her suspect there was anything inappropriate about the defendant's relationship with the victim. Mrs. Walker stated that she and the defendant had sexual intercourse one to two times per month and that ninety percent of the time the defendant had to inject himself with his medication in order to perform. She said that, after the allegations arose in the case, she checked and found nothing out of order in either the amount of the defendant's medication or the number of syringes in the house. She explained that this factor, combined with the victim's failure to tell anyone about the alleged abuse, led her to disbelieve the victim's allegations:

> I have not found any proof-[the victim] never came to me and said that anything happened. She never went to anybody else. Her relationship with [the defendant] never changed. She was always happy to see him. She-I didn't suspect a thing. I didn't find anything. When I went to count the syringes, I didn't find any medication gone and he never said to me that anything happened.

-10-

Mrs. Walker said that the defendant confessed that he had been having inappropriate feelings toward the victim after she confronted him about an email in which he told the victim that he loved and needed her. She denied that she ever deleted any "sexual" emails between the defendant and the victim. She testified that whenever the victim got into trouble, she insisted that she was going to live with her father when she turned thirteen, despite being told that a change in custody would require that the family go back to court. Mrs. Walker stated that the victim once told her that she "would do anything if she could move with her father."

On cross-examination, Mrs. Walker acknowledged that after she discovered the defendant's email, she called her mother, who was a legal secretary, and asked her to talk to the victim. She denied, however, that her mother warned her that in her experience the mother always loses custody when her child has been molested while in her custody.

Several of the defendant's friends, neighbors, and co-workers testified on the defendant's behalf, expressing their opinions as to his character and veracity. Darryl McKissack testified that he had known the defendant for almost three years, had grown to love him like a brother, and knew in his heart that he was an honest person. Judy McKissack testified she was Darryl McKissack's wife, had socialized with the defendant and his wife, and believed the defendant to be an "honest, hard-working man." Emerson Russell Dowling, Jr., the defendant's neighbor, testified that he had known the defendant for about twenty-one years and that he was "a good neighbor" and "a good friend." Mary Joyce Bumpus, another of the defendant's neighbors, testified that she had known the defendant since 1981 or 1982 and that he had always been honest with her and her husband. Bumpus said that she and her husband occasionally took the defendant's stepdaughters to church, that neither child ever disclosed to her that anything inappropriate was occurring, and that the victim always appeared to be a happy, well-adjusted child. Jim Gasaway, the defendant's supervisor at Hobby Lobby, testified that the defendant was a very honest person. Finally, Sidney Lee VanAntwerp, one of the defendant's co-workers at Hobby Lobby, testified that she thought the defendant was very honest. However, with the exception of Gasaway, the witnesses testified on cross-examination that they would not believe the defendant if he said he had sexual feelings for a twelve-year-old girl.

Detective Alan Charvis, recalled by the defendant, acknowledged that he did not employ the services of a computer forensic expert to attempt to

recover any deleted emails. He further acknowledged that he found no pornographic materials in the defendant's home and saw no signs that the carpet or couch had recently been cleaned or replaced.

The victim's younger sister, C.M., who was twelve years old at the time of trial, testified that when she lived with the defendant at the Barkwood Court residence her bedroom was the one furthest from the living room. She said the only thing she could hear from the living room when her bedroom door was open was the television set. C.M. stated that the victim never told her of any problems she was having with the defendant and that she never suspected anything improper was going on between them. On cross-examination, she testified that it was difficult for her to hear anything from the living room when her bedroom door was shut.

Anthony Scott McClure, the victim's father, testified that he was not aware of any dramatic personality changes in the victim after her mother married the defendant. He said that the victim did not tell him about the abuse; instead, he "found out from the State of Tennessee." He stated, however, that he believed the victim's allegations and that there was "[n]o question" in his mind that the defendant had violated his daughter.

Donna Kimsey, the victim's maternal grandmother, testified that she lived in Springfield, Illinois, and was a retired legal secretary for a small law firm that did not handle any child custody or domestic cases. She said she took the victim, with whom she had always had a close relationship, to a park to talk to her after receiving a phone call from the victim's mother, who was upset over the manner in which the defendant had ended an email to the victim. Kimsey stated that she asked the victim if she was having any problems with the defendant that she wanted to tell her about and that the victim got teary, bowed her head, and said only, "I can't, I can't." Kimsey denied that she yelled or tried to intimidate the victim. She testified that she never noticed any change in the victim's personality and that the victim appeared to have a good relationship with the defendant. On cross-examination, she denied that she ever suspected that the victim was being sexually abused.

*Walker*, 2006 WL 3313651, at *1-10. The jury convicted the Petitioner of two counts of rape of a child and one count of aggravated sexual battery. The trial court originally sentenced him to twenty-two years for each rape conviction, to be served concurrently, and ten years for the aggravated sexual battery conviction, to be served consecutively to the rape sentences, for an effective sentence of thirty-two years. At the motion for new trial hearing, the trial court

-12-

reduced the sentences for the rape of a child convictions to twenty years each and the sentence for the aggravated sexual battery conviction to eight years, making the total effective sentence twenty-eight years. The Petitioner appealed, and, on appeal, this Court found that the evidence was sufficient to sustain all three convictions. We, however, reversed the aggravated sexual battery conviction based upon inadequate testimony about the date this offense occurred, which was necessary because the bill of particulars identified this conviction as based upon a "masturbation that occurred in the living room of the residence in January 2000, while the defendant had his clothes on and his zipper open." Because the State was unable to elicit those identifying details from the victim at trial, her testimony did not establish that any masturbation occurred in January 2000, and we were constrained to reverse that conviction. As a result, the Petitioner's effective sentence became twenty years.

## B. Post-Conviction Facts

The Petitioner filed a timely petition for post-conviction relief in which he alleged that his trial counsel was ineffective in several ways. At the hearing on the petition, the following evidence was introduced: The Petitioner testified that he was serving a twenty-year sentence for his rape convictions. He said the attorney ("Counsel") who represented him during his trial was ineffective because he failed to adequately investigate his case. He also claimed that Counsel used a defense of impotence but failed to introduce available medical records regarding his medical condition. The Petitioner said Counsel also failed to subpoena the impotence specialist, Dr. Douglas Trapp, who the Petitioner had seen with regard to his condition. The Petitioner felt Dr. Trapp's testimony would have helped the jury understand that he had to inject himself to become erect and that these injections only took effect after a certain time period. The Petitioner felt that Dr. Trapp's testimony would also have refuted the State's claim that he had engaged in sexual intercourse with the victim every day, sometimes more than once a day, because the doctor would have testified that the Petitioner could not inject himself more than once in a twenty-four hour period.

The Petitioner also testified that Counsel failed to submit into evidence the report from the doctor in Illinois who examined the victim. The Petitioner said this doctor's report included the results of the victim's pelvic exam, which were inconclusive. The Petitioner said Counsel had this report but that Counsel never spoke with the doctor. When Counsel tried to introduce the report into evidence at trial, the court ruled the report was inadmissible hearsay.

The Petitioner alleged that Counsel had a conflict of interest when Counsel represented him because Counsel had previously represented the Petitioner's daughter and did not inform the Petitioner of this fact. The Petitioner said Counsel did not challenge his daughter's credibility when she testified against him during his trial. Further, the Petitioner said Counsel

-13-

vouched for his daughter's credibility by saying during closing argument that Counsel knew that the Petitioner's daughters were not lying. The Petitioner said that, had he known of this conflict, he would not have allowed Counsel to represent him.

The Petitioner testified that Counsel was ineffective in dealing with the Petitioner's uncharged conduct toward the victim. He said Counsel filed a motion in limine to exclude testimony of any uncharged acts, and the trial court granted this motion. The State, however, introduced testimony about uncharged conduct, and Counsel only objected once. Further, Counsel himself introduced instances of uncharged conduct. The Petitioner said Counsel was ineffective for mentioning these crimes, evidence of which the trial court had ruled inadmissible. Further, the Petitioner believed that the jury's repeated exposure to this uncharged conduct affected the verdict.

The Petitioner alleged that Counsel was ineffective for failing to object to the jury receiving, during deliberations, a copy of the transcript of the taped conversation between the Petitioner and his daughter. He said this allowed the jury to place great weight on this prejudicial evidence. About this same conversation, the Petitioner said Counsel was ineffective for failing to assert that his daughter's taping of this conversation, at the behest of law enforcement, violated his right against self-incrimination. Further, the tape was played for the jury before the Petitioner said whether he was going to testify, which he says forced him to testify. The Petitioner said he wished that Counsel had tried harder to exclude the tape.

The Petitioner's next set of allegations involved Counsel's failure to object to actions by the prosecutor. He testified the prosecutor improperly referred to evidence not submitted to the jury, including destroyed emails. The Petitioner said the prosecutor also improperly referred to "the Lolita complex" in front of the jury, which the Petitioner later learned was a reference to a book written about child pornography. The Petitioner said Counsel's failure to object allowed the jury to assume that the Petitioner was involved in child pornography. He further asserted that there is a federal case indicating that references to "Lolita" were improper.

The Petitioner testified that Counsel should have objected when the prosecutor improperly challenged the credibility of several witnesses by forcing them to call other witnesses liars. The Petitioner said the prosecutor called his wife a "perjurious liar," which was an improper comment on her testimony. The prosecutor also said that the Petitioner's mother-in-law had called her daughter a liar during the mother-in-law's trial testimony. The Petitioner also felt Counsel should have objected when the prosecutor "vouch[ed] for the credibility [of] certain witnesses."

The Petitioner testified that Counsel told him that the State had offered to settle the

case and that, in exchange for his guilty plea, he would receive eight years at one hundred percent. Counsel told the Petitioner not to take the plea deal, saying that the Petitioner possibly would not live eight more years considering his poor health. The Petitioner testified that Counsel never told him, however, that he was facing 120 years in prison if he was found guilty on all the counts. The Petitioner said, had he understood the ramifications of the charges against him he would have taken the plea offer.

The Petitioner next asserted that Counsel failed to investigate or interview the social worker in Illinois. The social worker's report included conflicting statements and statements that contradicted the victim's trial testimony. In one instance, the victim told the social worker she had never performed oral sex on the Petitioner, but she testified at trial that she performed oral sex on the Petitioner. Counsel attempted to put that evidence before the jury, but it was excluded as hearsay. The Petitioner testified that Counsel neither called the social worker to testify nor ensured her testimony could be admitted by other means.

On cross-examination, the Petitioner conceded that, at trial, the victim was forced to read the contradictory statements that she had made to the social worker into the record in front of the jury. About the expert testimony of Dr. Trapp, the Petitioner agreed that there was testimony in the record that the Petitioner could only inject himself with one vial of medicine during a twenty-four hour period, but he said the doctor's testimony would have been more persuasive. The Petitioner said he was still, at the time of the post-conviction hearing, unaware of the capacity in which Counsel had represented his daughter. He said this was the reason he did not know whether or not he would have allowed Counsel to continue to represent him had he known of the conflict.

The Petitioner agreed that the trial court ruled that testimony about fellatio, which was uncharged conduct, could not be admitted during trial. He disagreed that Counsel may have let this testimony in for a strategic reason, namely to show that the victim's statements to a social worker in Illinois varied greatly from her trial testimony.

Counsel testified that he investigated the Petitioner's impotence defense by obtaining the Petitioner's medical records. He and the Petitioner discussed whether to present expert testimony on the matter and the expense of so doing, and they both agreed that the testimony of the Petitioner and his wife on this matter would be sufficient. Counsel said he and the Petitioner had been friends before this case, and, as such, Counsel was well aware of the Petitioner's impotence and the car wreck that precipitated his impotence.

Counsel testified that he contacted the Petitioner's daughter, C.M., whom he described as "very hostile" toward him, and C.M. did not want to talk to him. Counsel filed a motion to suppress the tape-recorded conversation between the Petitioner and C.M. In the motion,

he relayed the circumstances surrounding the conversation, saying that the Petitioner called him on a Sunday and explained the allegations he faced. He told the Petitioner not to speak to anyone including law enforcement and family members and to come to his office the following day. When the Petitioner was asked by law enforcement to provide a statement, the Petitioner refused. Law enforcement approached the Petitioner's daughter and asked that she record a conversation with her father. The Petitioner engaged in the conversation with his daughter, which was played for the jury. Counsel said he argued "vehemently" to keep that conversation out, but the trial court ruled against him. Counsel said he incorrectly assumed that, once it was introduced as an exhibit, the jury was entitled to have it during deliberations, thus he did not object to the tape being taken into the jury room.

Counsel testified that he disclosed to the Petitioner that he had previously represented the Petitioner's other daughter, A.W. He said he told the Petitioner that, because he had represented A.W., he thought she would speak to him about this case. The Petitioner provided Counsel with A.W.'s telephone number, and Counsel called A.W. while the Petitioner was present. Counsel said A.W. was not hostile toward the Petitioner at trial, unlike the Petitioner's other daughter, C.M.

Counsel testified that he was provided discovery in this case, which included a report that showed that the victim's pelvic exam was inconclusive. He said he attempted to have the report admitted in court, but the trial court denied his motion. Counsel agreed that it would have been possible for him to issue a subpoena and take a deposition of the doctor who created the report. He said he discussed this with the Petitioner, and the two decided that Counsel should not take this measure based upon the expense and also upon the fact that they did not want the story of the victim, who was only twelve or thirteen, admitted through this deposition. Counsel agreed that he could have asked that the medical report be admitted as a business record if he requested that the custodian of records make the report a business record.

On cross-examination, Counsel testified that the Petitioner was not incarcerated before the trial and that there was a long delay between his arrest and the trial due to the Petitioner's poor health. During this delay, which lasted approximately eighteen months, Counsel met with the Petitioner regularly. In the last two weeks before the Petitioner's trial, the Petitioner was at Counsel's office several hours each day.

Counsel agreed that, before trial, the State offered to settle the case if the Petitioner agreed to serve eight years at 100%. Counsel relayed this offer to the Petitioner, who had recently been released from the hospital after suffering a brain aneurysm. The Petitioner said that eight years was a "death sentence" given his medical condition and asked Counsel what his chances at trial were. Counsel said he told the Petitioner that he thought the odds of the

Petitioner's being found guilty were "fifty-fifty." Counsel said that he went through the indictment with the Petitioner and discussed the minimum and maximum sentence for each charge the Petitioner faced.

Counsel testified that he filed a motion in limine to exclude testimony about the victim performing fellatio upon the Petitioner because the Petitioner was not charged with this conduct. The trial court granted this motion. Counsel explained that, before trial, he was aware that the victim told a social worker in Illinois she had never performed fellatio on the Petitioner. Based on this inconsistency with her earlier statement to the Illinois social worker, Counsel did not object to her testimony at trial that she had in fact performed fellatio in order to impeach her with the social worker's report. Counsel recalled that there were several instances during the victim's testimony where she contradicted the statement she gave the Illinois social worker, which he brought out during his cross-examination of the victim.

Counsel testified that he did not find the victim in this case credible. He said that, in addition to her contradictory statements to the Illinois social worker, there was no DNA evidence to corroborate the victim's story. Counsel recalled that the victim said that she and the Petitioner engaged in sexual conduct almost every day in various places in the house, including the couch and the carpet. When law enforcement officers searched those places for residual bodily fluids, they found no physical evidence to support the victim's allegations.

Based upon this evidence, the post-conviction court dismissed the Petitioner's petition for post-conviction relief.

## II. Analysis

The Petitioner makes numerous allegations on appeal, which fall into three primary categories: (1) Counsel was ineffective; (2) the prosecutor committed misconduct; and (3) his sentence is illegal. The State responds that the Petitioner waived many of his objections by failing to include a statement of facts in his brief and by inadequately citing to the record or legal authority. The Tennessee Rules of Appellate Procedure require that briefs include "[a] statement of facts, setting forth the facts relevant to the issues presented for review with appropriate references to the record." Tenn. R. App. P. 27(a)(6). Further, this Court may strike inadequate briefs. Tenn. R. Crim. App. 10(a). While the Petitioner's brief may include some technical inadequacies, we will nonetheless address the Petitioner's allegations that his trial counsel was ineffective. As we will explain in greater detail below, the Petitioner's allegations of prosecutorial misconduct are waived because he failed to raise the issue on direct appeal. We also will explain below why his allegations regarding his sentence do not entitle him to post-conviction relief.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

## A. Ineffective Assistance of Counsel

The Petitioner contends that his trial counsel was ineffective because he: (1) ineffectively asserted the defense of impotence; (2) failed to adequately investigate, interview, or subpoena a corroborating medical witness in Illinois; (3) failed to adequately investigate, interview, or subpoena the social worker in Illinois; (4) failed to persuade the trial court to suppress the Petitioner's recorded statements to his daughter; (5) failed to present the testimony of Randy Hultberg; (6) failed to inform the Petitioner of Counsel's previous representation of the Petitioner's daughter on an unrelated matter; (7) allowed and introduced the Petitioner's prior bad acts; (8) failed to argue that the State must elect offenses; (9) "failed to object"; (10) failed to object to the jury having a copy of the transcript of the tape-recorded conversation during deliberations; (11) forced witnesses to call other witnesses liars; (12) allowed the Petitioner to be presented with a "Hobson's Choice"; (13) failed to request a jury instruction for "contradiction statements instead of inconsistencies"; and (14) failed to adequately advise the Petitioner with respect to the State's proposed plea agreement.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was

deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## 1. Impotence Defense

The Petitioner asserts that, because he was "incapable of sex," the charges of rape against him are baseless. Further, he states that Counsel's failure to investigate his medical condition of impotence amounted to ineffective assistance because Counsel should have asserted that the Petitioner's impotence was a complete defense to the charge of rape. He states that Counsel should have obtained medical records and a deposition from the Petitioner's doctor regarding the Petitioner's impotence. Finally, he contends Counsel should have requested that the judge provide the jury special instructions regarding his impotence. The State counters that the Petitioner was not "incapable" of having sex because he could maintain an erection via a drug injection, therefore, his claim lacks merit.

In order to be entitled to post-conviction relief, a petitioner must show two things: that his counsel's performance was deficient and that he was prejudiced. *Strickland*, 466 U.S. at 687. In the case under submission, we need not address counsel's performance, which does not appear deficient, because the Petitioner clearly cannot show prejudice. First, the Petitioner's wife, Mrs. Walker, testified at trial that she and the Petitioner had sexual intercourse one to two times per month and that ninety percent of the time the Petitioner had to inject himself with his medication in order to perform. Thus, ten percent of the occasions on which the Petitioner had sex with his wife, he did so without medication. He is not, therefore, incapable of having sex without medication. Further, the Petitioner testified that he is able to sexually perform and maintain an erection with medication.

During the Petitioner's trial, both the Petitioner and his wife testified about his difficulties maintaining an erection without medication, and Counsel introduced medical records that supported this testimony. The Petitioner failed to provide any additional testimony at the hearing on his petition for post-conviction relief, in the form of his doctor's testimony or additional medical records, that would show how his doctor's testimony would have added to the testimony already presented to the jury. In the absence of any additional evidence, we are left to speculate about how the Petitioner's doctor's testimony would have aided his defense. Under these circumstances, we conclude that the Petitioner cannot show prejudice and is not entitled to post-conviction relief on this issue.

-20-

## 2. Inconclusive Pelvic Exam of Victim

The Petitioner next asserts that Counsel was ineffective for failing to introduce the victim's medical report into evidence. The report of that medical exam showed that the doctor performing the victim's pelvic exam found inconclusive evidence about whether the victim had previously engaged in sexual activity.

Counsel, who had been retained by the Petitioner, testified that he discussed this matter with the Petitioner before trial. He informed the Petitioner of the expense of deposing the doctor and of the risk that this deposition would lead to other damaging evidence, which the victim may have relayed to the doctor, being admitted into evidence. The two discussed alternative available evidence challenging the victim's story, namely, the Petitioner's difficulty maintaining an erection and the absence of semen from the locations in which the victim said the two had engaged in sexual activity. The Petitioner and Counsel then decided not to depose the doctor.

We conclude that Counsel's performance was not deficient in this regard. He discussed with the Petitioner the Petitioner's options on this issue and thoroughly reviewed the considerations with him. He and the Petitioner decided together that it was better not to depose this doctor for strategic reasons. Further, the Petitioner has failed to show how he was prejudiced in this regard. He did not present the doctor's testimony at his post-conviction hearing, and a copy of this doctor's report is not included in the appellate record. He is not, therefore, entitled to post-conviction relief on this issue.

## 3. Illinois Social Worker

The Petitioner next contends that Counsel was ineffective for not calling as a witness Karen Morelock, a social worker in Illinois who interviewed the victim. In the alternative, he states that Counsel should have sought to make Morelock's statements admissible via the business exception to the hearsay rule. The Petitioner asserts that the victim made several statements to Morelock that contradicted the victim's trial testimony and that Morelock's testimony would have had a greater impact had she testified in person.

At trial, the court allowed Counsel to impeach the victim with each of the inconsistencies he identified in Morelock's report. The victim was forced to read aloud to the jury portions of Morelock's report about their interview. In our opinion on direct appeal, we summarized the cross-examination, stating:

> On cross-examination, the victim acknowledged that she told Karen Morelock, the Illinois social worker who interviewed her on July 5 and July 19,

2001, that she thought she was the one who had deleted the emails, that she did not do anything with her mouth to the defendant, and that the sexual touching started in January 2000, as opposed to January 1999 as she stated in her direct examination testimony. At defense counsel's request, the victim read the following portion of her July 19 statement aloud: "I wouldn't do anything with my mouth to him, but he would lick my genital area." She agreed that the following statements in her July 19 statement were true: "It would be everyday beginning in January 2000"; "He would lick me, I had sex with him everyday for over one year"; and "[E]very once in a while, we would have sex one time in the morning and then when I would get home from school." The victim also testified, however, that her statement on direct examination that the abuse began in 1999 was true. She said the defendant first began touching her in January 1999, when she was ten years old and within a few months of his October 1998 marriage to her mother.

In light of this cross-examination, we conclude the Petitioner has not proven that he was prejudiced by Counsel's failure to have Morelock testify or to have her report independently admitted into evidence. It is clear from the record that the Petitioner was able to expose to the jury any and all inconsistencies between Morelock's report and the victim's trial testimony. He is not entitled to post-conviction relief on this issue.

### 4. Suppression of Petitioner's Statement

The Petitioner next contends that Counsel was ineffective when he failed to have the Petitioner's recorded statements suppressed. The Petitioner contends any statements made to his daughter, C.M., during a telephone conversation, was made to an "agent of the State" when he was "under extreme duress" in violation of his Fourth Amendment rights against illegal searches and his Fifth Amendment right against self-incrimination.

Before trial, Counsel filed a motion to suppress this tape recorded conversation, and he testified he argued "vehemently" to keep that conversation out, but the trial court ruled against him. The record shows that the Petitioner, who was not in police custody at the time, made these statements during a tape recorded conversation with his daughter. The record does not, however, include a copy of the motion to suppress or a copy of the transcript of the hearing on the motion to suppress. We are, therefore, left to speculate as to the arguments Counsel put forth. In any event, Counsel's performance was not deficient in that he attempted, albeit unsuccessfully, to suppress the Petitioner's statements. Further, the Petitioner has not successfully proven how he was prejudiced. The Petitioner is not entitled to relief on this issue.

-22-

### 5. Testimony of Randy Hultberg

The Petitioner contends Counsel was ineffective because he failed to present the testimony of Randy Hultberg. Hultberg completed a Comprehensive Sex Offender Pre-Sentence Evaluation that stated that the Petitioner was "low risk" and "a good candidate for probation." The Petitioner sought to have this introduced during the trial, and the trial court ruled that the Petitioner's tendencies with regard to re-offending were not proper testimony for the jury, whether that testimony be that he was at a high or a low risk for re-offending. The Petitioner did not call Hultberg to testify at the post-conviction hearing, and it is unclear from the Petitioner's brief what he thinks Counsel should have done differently.

Because the Petitioner presented no evidence at the post-conviction hearing to support this argument and because he makes no citations to any authority to support his argument, we conclude he has waived our review of this issue. The Rules of Appellate Procedure require that citations to authority and references to the record be included in the argument portion of the brief. Tenn. R. App. P. 27(a)(7). The rules of this Court also contemplate waiver of issues not supported by citation to authorities or appropriate references to the record. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). We deem this issue waived due to the failure to cite to any legal authorities.

### 6. Counsel's Prior Representation of the Petitioner's Daughter

The Petitioner next contends that Counsel was ineffective because Counsel failed to disclose his previous representation of the Petitioner's daughter, A.W., who testified at his trial. In his appellate brief, he states that he would have "never . . . allowed Counsel to represent him had he known of this conflict . . . ."

Counsel testified at trial that he disclosed to the Petitioner his previous representation of the Petitioner's daughter, A.W., on an unrelated matter and that he had a good relationship with her. He said that the Petitioner provided him A.W.'s phone number, and he called A.W. while the Petitioner was present to discuss the Petitioner's case. Counsel testified that, unlike the Petitioner's other daughter, C.M., A.W. was not hostile toward the Petitioner during the trial, which he attributed to his phone conversation with her. At the post-conviction hearing, the Petitioner was much less certain than in his brief about whether he would have allowed Counsel to continue representing him had he known of his representation of A.W., testifying that he did not think that he would have allowed Counsel to represent him. The Petitioner acknowledged at the post-conviction hearing that he did not know the details of that prior representation, and he presented no evidence about the details of that representation by calling A.W. to testify or by questioning Counsel in depth on this matter.

The post-conviction court, crediting Counsel's testimony, found that Counsel informed the Petitioner about his previous representation of A.W., and the Petitioner did not object to Counsel's continued representation of the Petitioner. We conclude that the evidence does not preponderate against this finding. The Petitioner has neither proven that Counsel was deficient in this regard nor that he was in some way prejudiced. He is not, therefore, entitled to post-conviction relief on this issue.

### 7. Prior Bad Acts

The Petitioner next asserts that Counsel was ineffective for not objecting to the State's introduction of his "prior bad acts," i.e. uncharged instances of fellatio testified to by the victim, and that Counsel was also ineffective for introducing such evidence himself. Counsel filed a motion in limine to have these instances of fellatio excluded, and the trial court granted this motion. The Petitioner points to Counsel's opening statement in which he stated that the jury would hear that the victim was going to testify that she and the Petitioner engaged in sexual activity every day, which was a direct violation of the motion in limine.

It is apparent from the trial transcript and Counsel's testimony at the post-conviction hearing that the defense strategy was to impeach the victim's credibility in several ways. Counsel sought to impeach the victim's testimony that she and the Petitioner engaged in sexual activity every day, sometimes twice a day, with the following evidence: that the Petitioner required an injection to maintain an erection; that he could not take such medication more than once per day; that there were only a few vials of the injection missing from the Petitioner's supply and that his wife could account for their use; that no bodily fluids were found by law enforcement in the places where the victim said the intercourse occurred; and that the victim made contradictory statements about the frequency, nature, and duration of the sexual contact. Counsel decided that it was to the Petitioner's advantage to have these instances brought in to bolster the argument that the victim was being untruthful and to prove that her testimony was improbable.

This Court addressed this issue during the Petitioner's direct appeal. We concluded that Counsel's failure to argue for the suppression of this evidence was deliberate and an "effort to point out the inconsistencies and improbabilities in the victim's accounts to the Illinois social worker." When ruling on this issue, the post-conviction court found, "Using these [instances of prior bad acts] was to the advantage of the Petitioner not to his disadvantage." We agree. While, in hindsight, there may have been another defense strategy that may have been more successful, the one that Counsel asserted was reasonable in light of the evidence. The fact that a particular strategy or tactic failed does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515. The Petitioner is not entitled to relief on this issue.

## 8. Election of Offenses

The Petitioner next contends that Counsel's assistance was ineffective because he failed to argue that the State must elect offenses. This issue was addressed by this Court on the Petitioner's direct appeal. We stated:

> We agree with the defendant that an election of offenses and enhanced unanimity instruction should have been given. However, we find the error to have been harmless with respect to Counts One and Six. Although the victim testified that she had had sexual intercourse with the defendant on numerous different occasions and locations during the time she lived with him at the Barkwood Court residence, she described only two incidents in detail: the May 28, 2001, rape in the living room and the second rape that occurred in the living room during the school spring break of 2001. There was, therefore, no danger that the jurors might have been considering different offenses when deliberating on those counts. Such a danger did exist, however, with respect to the aggravated sexual battery count of the indictment. That offense was narrowed as to time and act, but the proof at trial did not correspond to the time frame selected and there was evidence of more than one occasion on which the act of masturbation occurred.
>
> Our supreme court addressed a similar situation in *State v. Brown*, 992 S.W.2d 389 (Tenn. 1999), in which a child rape victim testified about multiple instances of penetration, the State did not elicit identifying details from the victim about the single count for which the defendant was on trial, and the proof did not correspond to the time frame the State selected for the offense:
>
> > The prosecution did not attempt to clarify the victim's testimony, or clarify the conflicts in the testimony, either by eliciting additional details or by relating the timing of the abuse to some other occasion in the victim's life. Moreover, instead of relying upon the few details that were elicited, for example, an incident that occurred on a Friday when it was warm, to make the election, the prosecution did not elect a specific offense but simply narrowed the time-frame of the charged offense from the period alleged in the indictment (March 1, 1993, to September 30, 1993) to an offense occurring between Easter, April 11, 1993, and June 30, 1993. This time-frame limitation was not an election and failed to ensure that the jury would focus on a single offense.

-25-

Moreover, as the State now concedes on appeal, the deficiency in the election at trial was further compounded by the fact that the time-frame chosen by the prosecutor was simply inaccurate. A close reading of the testimony reveals that the victim testified that acts of digital penetration were committed by Brown in Brown's trailer prior to the occasion on which Brown took the photographs of the victim. The victim's mother testified that she saw the photograph of the victim prior to Easter, April 11, 1993. The State nonetheless "elected" an offense between April 11, 1993 and June 30, 1993-a period for which the victim described no specific offenses. Accordingly, even had the elected offense been sufficiently detailed, the evidence did not support the time-frame selected by the State.

*Id.* at 392 (footnote omitted).

In the bill of particulars, the State identified Count Three as a masturbation that occurred in the living room of the residence in January 2000, while the defendant had his clothes on and his zipper open. The State was unable, however, to elicit those identifying details from the victim at trial, and her testimony did not establish that any masturbation occurred in January 2000. Accordingly, we must reverse the defendant's conviction for aggravated sexual battery and remand for a new trial on that offense.

*Walker*, 2006 WL 3313651, at *15-16.

Because this Court has previously addressed this issue and found the error harmless as to all convictions save one, which we reversed and remanded for a new trial, the Petitioner cannot show any prejudice with regard to Counsel's performance. He is not entitled, therefore, to post-conviction relief on this issue.

### 9. Failure to Object

The Petitioner's next contention reads, "Numerous times the failed [sic] to object and this failure prejudiced the Appellant and deprived him of his Constitutional right to a fair trial." In the next section of his brief, the Petitioner cites to one instance where Counsel, during a side bar, told the trial judge that he did not want to delay things by "jumping up and down objecting." There are no citations to the record, however, identifying the occasions on which Counsel should have objected.

As previously stated, the rules of this Court contemplate waiver of issues not supported by citation to authorities or appropriate references to the record. *See* Tenn. R. Ct. Crim. App. 10(b) (stating that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court"). This issue is waived.

### 10. Transcript of Telephone Conversation

The Petitioner next asserts that Counsel's representation was ineffective because he allowed a transcript of the tape recorded conversation between the Petitioner and his daughter, C.M., to go into the jury room during deliberations. He contends Counsel should have objected to the jury's having this transcript on the basis that he would be unduly prejudiced by submission of the exhibit to the jury.

When ruling on this issue, the post-conviction court stated: "The court is unable to find that the Petitioner suffered any prejudice from any lack of objections. The court is not finding that [Counsel] was ineffective for not making the objections referred to by the Petitioner."

Tennessee Rule of Criminal Procedure 30.1 states, "Unless for good cause the court determines otherwise, the jury shall take to the jury room for examination during deliberations all exhibits and writings, except depositions, that have been received in evidence." The Advisory Commission Comments to this section state:

> This rule, applicable in criminal cases, is mandatory unless the judge, either on motion of a party or sua sponte, determines that an exhibit should not be submitted to the jury. Among the reasons why a particular exhibit might not be submitted are that the exhibit may endanger the health and safety of the jurors, the exhibit may be subjected to improper use by the jury, or a party may be unduly prejudiced by submission of the exhibit to the jury.

We conclude that the Petitioner has failed to show prejudice because the tape recording of the conversation would have been allowed into the jury room over Counsel's objection. Counsel filed a motion to suppress this tape recording, which was unsuccessful. It is likely that once the tape was made an exhibit and played for the jury, the jury would have been entitled to have the tape in the jury room. The transcript, though an accurate account of the tape, would have been open to challenge on the basis that it would have only been produced to aid the jury while the tape was played. The jury's having had the transcript in the deliberation room, however, does not undermine our confidence in the verdict. The Petitioner is not entitled to relief on this issue.

## 11. Forcing A Witness to Call Another Witness a "Liar"

The Petitioner next contends that Counsel was ineffective when he asked the witness if the testimony of another witness was a lie. The Petitioner cites to a Federal case from the seventh circuit that holds that, "Because credibility questions are for the Jury, it is improper to ask one witness to comment on the veracity of the testimony of another witness." *See U.S. v. Freitag*, 230 F.3d 1019 (7th Cir. 2000). In *Freitag*, the counsel for the prosecution asked the defendant, who testified, whether she herself was being truthful and whether other witnesses were being truthful. *Id*. at 1024. The *Freitag* court ultimately held, "Assuming *arguendo* that all the questions Freitag objects to are improper, we find the resulting error to be harmless." *Id*. We can find no Tennessee case adopting a holding that counsel for the defense or prosecution may not ask a witness whether another witness is truthful. The Petitioner is not entitled to post-conviction relief on this issue.

## 12. "Hobson's Choice"

The Petitioner next asserts that he was forced to testify because the State played the tape recorded conversation he had with his daughter. The admission of these "erroneously admitted statements" left him with a "Hobson's Choice,"[1] meaning that he must remain silent and allow the jury to consider the highly damaging statements or testify and seek to rebut them. The Petitioner fails to mention what, if any, action by Counsel was ineffective.

We conclude the Petitioner is not entitled to post-conviction relief on this issue. First, as previously discussed, Counsel did everything possible to attempt to suppress the tape recorded conversation. He filed a motion to suppress, which included the circumstances surrounding the Petitioner's daughter's initiation of this phone conversation and "vehemently" argued that motion to the trial court. Again, that motion and the hearing on that motion are not included in the record. We conclude Counsel was not deficient in this regard. Second, we conclude that any argument that the Petitioner seeks to make about the trial court's admission of this tape recording is not a proper argument for a post-conviction proceeding. The Petitioner raised several alleged errors in evidentiary rulings on his direct appeal, but he did not raise the issue of whether this tape was properly admitted. *See Walker*, 2006 WL 3313651, at *16-17. Therefore, any objection to the trial court's evidentiary ruling is waived.

---

[1] A "Hobson's Choice" is a free choice in which only one option is offered. As a person may refuse to take that option, the choice is therefore between taking the option or not; "take it or leave it." The phrase is said to originate from Thomas Hobson (1544–1631), a livery stable owner at Cambridge, England. To rotate the use of his horses he offered customers the choice of either taking the horse in the stall nearest the door or taking none at all. MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 551 (10th ed. 1997).

*See* T.C.A. § 40-30-106(g) (2006)

### 13. Jury Instruction for "Contradiction Statements Instead of Inconsistencies"

The Petitioner next asserts that Counsel was ineffective for failing to request a "jury instruction for contradiction statements instead of inconsistencies." In this portion of his brief he cites to Tennessee law that "contradictory statements by the same witness regarding a single fact cancel each other out." *See Church v. Perales*, 39 S.W.3d 149, 169 (Tenn. Ct. App. 2000). There is no citation to the record and no argument about what testimony the Petitioner asserts contradicted itself, what jury instruction was given, or what Counsel should have done differently. This issue is waived. *See* Tenn. R. Ct. Crim. App. 10(b) (stating that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court").

### 14. State's Plea Offer

The Petitioner next contends that Counsel failed to adequately advise the Petitioner with respect to the State's plea offer of eight years. At the post-conviction hearing, Counsel testified that, before trial, the State offered to settle the case if the Petitioner agreed to serve eight years at one hundred percent. Counsel said he relayed this offer to the Petitioner, who had recently been released from the hospital after suffering a brain aneurysm. Counsel said the Petitioner responded that eight years was a "death sentence" given his medical condition and then asked Counsel what Counsel believed his chances at trial were. Counsel said he told the Petitioner that he thought the Petitioner's odds of being found guilty were fifty-fifty. Counsel said that he went through the indictment with the Petitioner and discussed the minimum and maximum sentence for each charge the Petitioner faced.

We conclude the Petitioner has not proven by clear and convincing evidence that Counsel was deficient in this regard. The Petitioner testified that Counsel urged him to reject the plea offer, emphasizing the likelihood that the Petitioner would die within the next eight years and that Counsel did not inform him of the potential sentence he could receive if found guilty. Counsel, however, testified the Petitioner raised the possibility that he would die before the end of an eight-year sentence, not Counsel, and rejected the State's offer on that basis. Counsel also testified that he informed the Petitioner of the sentences he could receive if found guilty. By denying post-conviction relief on this basis, the post-conviction court necessarily found Counsel's testimony more credible than that of the Petitioner. We will not disturb that finding. The Petitioner is not entitled to relief on this issue.

### II. Prosecutorial Misconduct

-29-

The Petitioner alleges numerous ways in which the prosecutor committed misconduct, which, he asserts, deprived him of due process and a fair trial. No claim of prosecutorial misconduct was raised on direct appeal. *See Walker*, 2006 WL 3313651, at *1. This issue is waived. *See* T.C.A. § 40-30-106(g) (2006) (providing that claims are waived if they could have been, but were not, presented in an earlier proceeding); *see also Tony A. Phipps v. State*, No. E2008-01784-CCA-R3-PC, 2010 WL 3947496, at *14 (Tenn. Crim. App., at Knoxville, Oct. 11, 2010), *no Tenn. R. App. P. 11 application filed.*

### III. Cumulative Effect of Error

Finally, the Petitioner contends that the cumulative effect of the errors alleged above entitles him to a new trial. Having found no error, we conclude that the Petitioner is not entitled to relief on this issue.

### IV. Sentencing

The Petitioner contends that his sentence is illegal because the Tennessee Supreme Court established a new rule of law in *State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007), that applies to his convictions and sentences, requiring that his sentences be modified and corrected in accordance with *Gomez*. The State counters that the Petitioner waived our review of this issue by not presenting his sentencing claim on direct appeal.

The Petitioner was convicted on May 29, 2003, and he was sentenced on September 11, 2003. The Petitioner filed a motion for new trial on October 2, 2003, and, by the time it was heard on December 10, 2004, the United States Supreme Court had released its decision in *Washington v. Blakely*, 542 U.S. 296 (2004). In accordance with *Blakely*, the trial court reduced the Petitioner's sentence to the presumptive sentence within his range, but it did not further reduce his sentence by finding that there were mitigating factors that applied to the Petitioner's sentence. The Petitioner's actual complaint on appeal, therefore, is that the trial court erred when it did not reduce his sentence further by finding applicable mitigating factors.

As we previously noted with respect to the Petitioner's claims of prosecutorial misconduct, the post-conviction statute mandates that claims are waived if they could have been, but were not, presented in an earlier proceeding. *See* T.C.A. § 40-30-106(g). Though the Petitioner has waived review of this issue we will briefly address the Petitioner's contention.

In June 2004, the United States Supreme Court held in *Blakely* that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed

statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Blakely*, 542 U.S. at 301 (quoting *Apprendi*, 530 U.S. 466, 490 (2000)). The Court held that, for Sixth Amendment purposes, the "statutory maximum" to which a trial court may sentence a defendant may be based only on those facts reflected in the jury verdict or admitted by the defendant. *Id*. at 542. Under *Blakely*, then, the maximum sentence which may be imposed is the presumptive sentence applicable to the offense. *See id*. The trial judge may impose a sentence that exceeds the presumptive sentence based only on the fact of a defendant's prior conviction(s) or on other enhancement factors found by the jury or admitted by the defendant.

Following *Blakely*, the Tennessee Supreme Court concluded in *State v. Gomez*, 163 S.W.3d 632, 661 (Tenn. 2005) ("*Gomez I*"), that the Tennessee Sentencing Reform Act of 1989 did not impermissibly infringe on the province of the jury in violation of a defendant's Sixth Amendment right to jury trial. Thereafter, the United States Supreme Court vacated the decision in *Gomez I* and remanded for reconsideration in light of its decision in *Cunningham v. California*, 549 U.S. 270 (2007). On remand, our Supreme Court held that a trial court's enhancement of a defendant's sentence on the basis of judicially determined facts other than the defendant's prior convictions violates the defendant's Sixth Amendment rights. *State v. Gomez*, 239 S.W.3d 733, 740-41 (Tenn. 2007) ("*Gomez II*").

*Gomez II*'s modification of sentencing law does not affect the Petitioner because, at the motion for new trial hearing, the trial court reduced the Petitioner's sentence to the presumptive sentence. The trial court was required to begin the Petitioner's sentencing determination at the midpoint of the range for a Class A felony, twenty years; therefore, the Petitioner received the presumptive sentence as designated by statute. *See* T.C.A. § 40-35-210(c) (2003). The Petitioner instead complains that the trial court should have applied several mitigating factors, which is not a *Blakely* issue.

Finally, to the extent that Petitioner is attempting to gain relief from his sentence via retroactive application of the *Blakely* decision, we note that this Court has repeatedly held that *Blakely* did not announce a new rule of law entitled to retroactive application in a post-conviction proceeding. *See e.g., Glen Cook v. State*, No. W2006-01514-CCA-R3-PC, 2008 WL 821532, at *10 (Tenn. Crim. App., at Jackson, Mar. 27, 2008), *perm. app. denied*, (Tenn. Sept. 29, 2008); *Carl Johnson v. State*, No. W2003-02760-CCA-R3-PC, 2005 WL 181699, at *4 (Tenn. Crim. App., at Jackson, Jan. 25, 2005), *no Tenn. R. App. P. 11 application filed*; *Donald Branch v. State*, No. W2003-03042-CCA-R3-PC, 2004 WL 2996894, at *9-10 (Tenn. Crim. App., at Jackson, Dec. 21, 2004), *no Tenn. R. App. P. 11 application filed*. Therefore, Petitioner has not alleged a cognizable basis for post-conviction relief, and he is not entitled to relief on this issue.

## II. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly dismissed the Petitioner's petition for post-conviction relief.

_____
ROBERT W. WEDEMEYER, JUDGE